State of Nebraska, appellee, v.
Dominick L. DuBray, appellant.

___ N.W.2d ___

Filed October 10, 2014.    No. S-12-1171.

1. **Trial: Photographs.** The admission of photographs of a gruesome nature rests
largely with the discretion of the trial court, which must determine their relevancy
and weigh their probative value against their prejudicial effect.
2. **Trial: Photographs: Appeal and Error.** An appellate court reviews a trial
court's admission of photographs of a victim's body for abuse of discretion.
3. **Homicide: Photographs.** If the State lays proper foundation, photographs that
illustrate or make clear a controverted issue in a homicide case are admissible,
even if gruesome.
4. **____: ____.** In a homicide prosecution, a court may admit into evidence photo-
graphs of a victim for identification, to show the condition of the body or the
nature and extent of wounds and injuries to it, and to establish malice or intent.
5. **Criminal Law: Evidence.** The State is allowed to present a coherent picture
of the facts of the crimes charged, and it may generally choose its evidence in
so doing.
6. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A
party who fails to make a timely motion for mistrial based on prosecutorial mis-
conduct waives the right to assert on appeal that the court erred in not declaring
a mistrial due to the misconduct.
7. **Trial: Prosecuting Attorneys: Appeal and Error.** When a defendant has not
preserved a claim of prosecutorial misconduct for direct appeal, an appellate
court will review the record only for plain error.
8. **Appeal and Error.** An appellate court may find plain error on appeal when an
error unasserted or uncomplained of at trial, but plainly evident from the record,
prejudicially affects a litigant's substantial right and, if uncorrected, would
result in damage to the integrity, reputation, and fairness of the judicial process.
Generally, an appellate court will find plain error only when a miscarriage of
justice would otherwise occur.
9. **Trial: Prosecuting Attorneys.** Prosecutors are charged with the duty to conduct
criminal trials in a manner that provides the accused with a fair and impar-
tial trial.
10. **Trial: Prosecuting Attorneys: Words and Phrases.** Generally, prosecutorial
misconduct encompasses conduct that violates legal or ethical standards for vari-
ous contexts because the conduct will or may undermine a defendant's right to a
fair trial.
11. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim
of prosecutorial misconduct, an appellate court first considers whether the pros-
ecutor's acts constitute misconduct. If it concludes that a prosecutor's act were
misconduct, it next considers whether the misconduct prejudiced the defendant's
right to a fair trial.
12. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mis-
lead and unduly influence the jury is not misconduct.

13. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.

14. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

15. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.

16. **Trial: Prosecuting Attorneys: Juries.** Prosecutors are not to inflame the jurors' prejudices or excite their passions against the accused. This rule includes intentionally eliciting testimony from witnesses for prejudicial effect.

17. ____: ____: ____. Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities and personal attributes of the victim. These facts lack any relevance to the criminal prosecution and have the potential to evoke jurors' sympathy and outrage against the defendant.

18. **Trial: Prosecuting Attorneys: Evidence.** A prosecutor commits misconduct when he or she persists in attempting to introduce evidence that the court has ruled inadmissible. This prohibition precludes an artful examination that refers directly to the inadmissible evidence.

19. **Prosecuting Attorneys.** A prosecutor's attributing deceptive motives to a defense counsel personally or to defense lawyers generally constitutes misconduct.

20. **Trial: Prosecuting Attorneys.** When a prosecutor's comments rest on reasonably drawn inferences from the evidence, he or she is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. These types of comments are distinguishable from attacking a defense counsel's personal character or stating a personal opinion about the character of a defendant or witness.

21. **Trial: Prosecuting Attorneys: Juries.** A distinction exists between arguing that a defense strategy is intended to distract jurors from what the evidence shows, which is not misconduct, and arguing that a defense counsel is deceitful, which is misconduct.

22. **Postconviction: Effectiveness of Counsel: Appeal and Error.** A defendant who is represented by different counsel in his or her direct appeal must raise any known or apparent claims of the trial counsel's ineffective assistance, or the claim will be procedurally barred in a later postconviction proceeding.

23. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

24. **Criminal Law: Effectiveness of Counsel.** A defense counsel's performance was deficient if it did not equal that of a lawyer with ordinary training and skill in criminal law.

25. **Effectiveness of Counsel: Proof: Words and Phrases: Appeal and Error.** To show prejudice from a trial counsel's alleged deficient performance, a defendant must demonstrate a reasonable probability that but for his or her trial counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. An appellate court focuses on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.

26. **Effectiveness of Counsel: Proof.** The two components of the ineffective assistance test, deficient performance and prejudice, may be addressed in either order. If it is more appropriate to dispose of an ineffective assistance claim due to the lack of sufficient prejudice, a court will follow that course.

27. **Postconviction: Effectiveness of Counsel: Appeal and Error.** When an appellate court reviews a claim of ineffective assistance of counsel in a postconviction proceeding, it often, but not always, presents a mixed question of law and fact.

28. **Effectiveness of Counsel: Appeal and Error.** For "mixed question" ineffective assistance claims, an appellate court reviews the lower court's factual findings for clear error but independently determines whether those facts show counsel's performance was deficient and prejudiced the defendant.

29. ____: ____. In reviewing claims of ineffective assistance on direct appeal, an appellate court is deciding only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?

30. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** If an alleged ineffective assistance claim rests solely upon the interpretation of a statute or constitutional requirement, which claims present pure questions of law, an appellate court can decide the issue on direct appeal. Otherwise, it addresses ineffective assistance claims on direct appeal only if the record is sufficient to review these questions without an evidentiary hearing.

31. **Confessions: Police Officers and Sheriffs: Due Process.** Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.

32. **Confessions: Due Process: Case Overruled.** Nebraska's requirement that a defendant's incriminating statements to private citizens must be voluntary to be admissible is incorrect under established due process precedents, overruling *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985), and *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000).

33. **Criminal Law: Confessions: Rules of Evidence.** A defendant should challenge incriminating statements allegedly procured through a private citizen's coercion or duress under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008).

34. **Effectiveness of Counsel.** Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant who claims ineffective assistance of counsel is not prejudiced by an alleged error that deprives the defendant of the chance to have a court make an error in his or her favor.

35. **Criminal Law: Intoxication: Intent: Jury Instructions.** Under Nebraska common law, intoxication is not a justification or excuse for a crime, but it may be considered to negate specific intent. To submit this defense to the jury, however, the defendant must not have become intoxicated to commit the crime and, because of the intoxication, must have been rendered wholly deprived of reason.

36. **Jury Instructions: Appeal and Error.** Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.

37. **Homicide: Words and Phrases.** Voluntary manslaughter is an intentional killing committed under extenuating circumstances that mitigate, but do not justify or excuse, the killing.

38. **Homicide: Evidence.** For a defense of sudden quarrel, Nebraska law requires an objective standard for determining whether the evidence shows a sufficient provocation that would cause a loss of self-control.

39. **Homicide: Intoxication: Intent.** Intoxication is not relevant in determining the reasonableness of a defendant's response to a claimed provocation. Because the defendant has intentionally killed another person, an objective reasonable person test is the appropriate means of determining whether the law should recognize the circumstances as warranting a reduction from murder to manslaughter.

40. **Homicide.** The concept of manslaughter is a concession to the frailty of human nature, but it was not intended to excuse a defendant's subjective personality flaws.

41. **Trial: Effectiveness of Counsel: Prosecuting Attorneys: Appeal and Error.** In determining whether a defense counsel's failure to object to prosecutorial misconduct rendered the trial unreliable or unfair, an appellate court considers whether the defendant's right to a fair trial was prejudiced because of the prosecutorial misconduct.

Appeal from the District Court for Box Butte County: Travis P. O'Gorman, Judge. Affirmed.

James R. Mowbray and Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

# I. SUMMARY

The State charged Dominick L. Dubray with two counts of first degree murder for killing Catalina Chavez and Mike

Loutzenhiser, and two related counts of use of a deadly weapon to commit a felony. The bizarre, bloody scene revealed that the victims died from multiple stab wounds. Dubray's defense centered on his claims that the evidence showed he had killed the victims in self-defense or upon a sudden quarrel. A jury found Dubray guilty of all four counts. The court sentenced him to terms of life imprisonment for each of the murder convictions and to terms of 30 to 40 years' imprisonment for each of the use of a deadly weapon convictions, with all terms to be served consecutively. This is Dubray's direct appeal.

Dubray assigns trial errors related to an evidentiary ruling, a jury instruction, prosecutorial misconduct, and his trial counsel's performance. We conclude that his claims are either without merit or do not constitute reversible error. We affirm.

## II. BACKGROUND

These murders occurred on Saturday morning, February 11, 2012. Dubray and Chavez had lived together for 2 to 3 years in Alliance, Nebraska, with their child and Chavez' older child from a previous relationship. Chavez' 16-year-old half brother, Matthew Loutzenhiser (Matthew), had also been living at their house since June 2011. Loutzenhiser, who lived in Scottsbluff, Nebraska, was Chavez' stepfather and Matthew's father.

On Friday, February 10, 2012, Loutzenhiser arrived in Alliance for a visit. Dubray worked that day from 5 a.m. to 1 p.m. Matthew was scheduled to work that night, and Chavez asked Dubray's mother to watch her two children overnight while the adults went out. Dubray went to a club with Chavez and Loutzenhiser around 8 p.m. They stayed there drinking alcoholic beverages until 1 a.m. and then went to Dubray's aunt's home and continued drinking with four other people until about 6 a.m. Loutzenhiser walked with Dubray and Chavez back to their nearby house. A business surveillance camera captured them walking back to the house around 6 a.m.

Matthew fell asleep around 1 a.m. in his bedroom, located off of the living room. He testified that he heard yelling

through his closed door before 6 a.m. but that he ignored the yelling because he thought the adults were intoxicated.

According to Dubray's cousin, Carlos Reza, Dubray called Reza at 6:49 a.m. Dubray said, "'I love you, Bro. Take care of my daughter.'" He said that he was going to kill himself and that he had two dead bodies in the house. Reza immediately dressed and drove to Dubray's house, which was about 5 minutes away. En route, he called another cousin, Marco Dubray (Marco), who also drove to Dubray's house.

When Reza entered the house, he immediately saw Loutzenhiser's motionless body lying against the living room couch with a lot of blood under him. Reza began screaming for Dubray and walked into his bedroom. He found Dubray, covered in blood, lying on the floor by his bed. The television was knocked over, the mattress was sideways, and clothes were all over the room. Dubray did not move initially, but he got up in response to Reza's yelling and walked into the kitchen.

When Reza asked what happened, Dubray began crying and shaking his head. He told Reza that Chavez was going to leave him. At some point, Dubray said, "'I can't believe what I have done.'" Dubray told Reza that he had tried to kill himself because he did not want to go to prison. He showed Reza a stab wound to the left of his heart where he had tried to kill himself. Reza could also see a cut on Dubray's neck and blood dripping on the back of his neck. Dubray picked up a clean knife and told Reza that he was going to kill himself, but he put the knife down on the kitchen table.

Marco arrived 5 or 10 minutes after Reza. When Marco entered, he saw Loutzenhiser's body in the living room and Dubray and Reza standing by the kitchen table. When Marco asked what happened, Dubray responded, "'I don't know. I snapped. And I just [want to kill] myself.'"

Marco and Reza were asking aloud what they should do, and Dubray responded, "'I just want to die. I don't want to go to prison.'" At this point, Reza said that he was going to call Lonnie Little Hoop, who was Dubray's and Reza's uncle. But Dubray told Reza not to call Little Hoop. He then told Marco and Reza to both go outside. They told Dubray that

they loved him and went outside, intending to let him kill himself. While Marco and Reza were outside, they decided to seek help. They both said they went next door to ask Dubray's father for help, but he was apparently unavailable. Reza then called Little Hoop. While waiting for Little Hoop, Reza said he heard Dubray screaming inside and believed that the screaming was coming from Dubray's bedroom.

Little Hoop said that he received Reza's call about 7:05 a.m. and that he lived 3 to 4 minutes away. When he got there, Little Hoop and Reza entered the house and Little Hoop called for Dubray. Dubray was lying on the floor by his bed again, but this time with a knife in his back. When Little Hoop called him, Dubray pushed his upper body up and leaned against the bed. Dubray told Little Hoop the same thing that he had said to Marco and Reza, i.e., that he did not want to live anymore and did not want to go to jail. When Dubray lay back down, Little Hoop could see a body under him. Little Hoop told Dubray not to move until he got help and told Reza to call an ambulance.

Reza saw two patrol cars close by and ran over to the officers to request an ambulance. One of the officers was State Patrol Trooper Craig Kumpf, and the other one was Officer Matthew Shannon with the Alliance Police Department. Shannon requested an ambulance, and then the two officers entered the house. Shannon said he saw wounds to Loutzenhiser's neck and shoulder and could not detect signs of life. Kumpf said Loutzenhiser's neck was nearly severed. The officers followed a trail of blood through the kitchen to the bedroom. Dubray was still lying on the floor with a knife in his back. Shannon moved closer and saw a smaller, motionless female under his body. After finding the three bodies, the officers discovered Matthew in the closed bedroom off the living room and placed him in a patrol car.

The ambulance arrived at 7:22 a.m. Loutzenhiser, Chavez, and Dubray were all initially pronounced dead at the scene; the supervising emergency medical technician could not detect Dubray's pulse, and there were no signs of breathing or response to stimulation. The emergency medical personnel then left the house. But while taking photographs, Shannon saw

Dubray move and heard him moan when Shannon called his name. Shannon called back the emergency medical personnel, who pulled Dubray from the area between the bed and the wall. There was a knife on the floor, and a knife impaled in the right side of Dubray's back. While readying Dubray for a move, the bedsheet moved and they found another knife. When they got outside, they put Dubray in a gurney, and Dubray then pulled the knife out of his back and dropped it. He was taken to the emergency room at the county hospital.

Because the evidence of Dubray's injuries is relevant to his defenses and ineffective assistance claims, we recount that evidence in detail. A trauma surgeon diagramed Dubray's 17 stab wounds or lacerations. Dubray had nine lacerations on his neck. The surgeon considered three of the stab wounds to his body to be potentially life threatening. During exploratory surgery, however, the surgeon determined that only the stab wound near Dubray's heart was life threatening. He considered the other wounds, including the neck lacerations, to be superficial, meaning that they might require stitches or similar care, but not surgery. The surgeon saw no blackening under Dubray's eyes or behind his ears that would have indicated a skull fracture, and a CAT scan revealed no trauma to his head. After stabilizing Dubray, the surgeon sent him to a hospital in Denver, Colorado, for surgical treatment of his chest wound. He was sedated for this trip and accompanied by his sister. She testified that she and other family members saw him in the intensive care unit about noon the next day and that Dubray was sitting up and talking.

While the police were interviewing Reza, he learned that Dubray had been transported to the Denver hospital. Reza went to the hospital with others the next morning to see Dubray. He said Dubray had two black eyes and a crooked nose. Dubray's aunt, sister, and mother gave similar testimony about his appearance. Reza was shown a photograph of Dubray that the prosecutor said was taken 2 days after Reza saw him. But Reza denied that the depiction reflected Dubray's appearance when he saw Dubray because it did not show his "fat lips" or black eyes. Reza said that when he saw Dubray, Dubray was sedated, his hands were secured to the bed, and he would

come in and out of consciousness. During this visit, Dubray told Reza that he had "fucked up."

The pathologist who performed the forensic autopsies of Chavez' and Loutzenhiser's bodies found 22 stab wounds or cuts to Loutzenhiser's body: three in his neck, five in his chest, four in his upper extremities, and 10 in his posterior neck and upper back. The pathologist explained that the depth of some wounds, which were deeper than the length of the knife blade, indicated the force with which the knife had been thrust into Loutzenhiser's body. The pathologist found 19 stab wounds or cuts to Chavez' body: 10 wounds to her neck, one to her chest, one to her abdomen, one to her shoulder, numerous wounds to her upper back and posterior neck, and defensive wounds to her hands.

At trial, the court instructed the jury on the elements of first degree murder and the lesser-included offenses of second degree murder and manslaughter. In addition, the court instructed the jury that it must find that Dubray did not act in self-defense. The jury returned a verdict of guilty for both counts of first degree murder and both counts of use of a weapon to commit a felony.

## III. ASSIGNMENTS OF ERROR

Dubray's nine assignments of error fall into three categories, with some factual overlap: trial court error, prosecutorial misconduct, and ineffective assistance of counsel. Regarding the trial court's actions, Dubray assigns that under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), the court erred in admitting cumulative, misleading, and gruesome photographs, despite their prejudicial effect. Relatedly, he assigns that his trial counsel was ineffective to the extent that he failed to object to the court's admission of the photographs.

Regarding the State's actions, Dubray assigns prosecutorial misconduct in the prosecutor's closing argument and questioning of witnesses. He also assigns that his trial counsel was ineffective in failing to object to this alleged misconduct.

Regarding his trial attorney's actions, Dubray assigns that in addition to failing to preserve the above trial errors, his attorney was ineffective as follows:

(1) failing to move to suppress Dubray's involuntary statements;

(2) failing to request a jury instruction on intoxication or to challenge the constitutionality of Neb. Rev. Stat. § 29-122 (Cum. Supp. 2012);

(3) failing to object to the court's jury instruction defining sudden quarrel;

(4) failing to call Megan Reza to testify that Chavez kept one of the knives used in the murder in her bedroom for self-protection; and

(5) failing to subpoena Jonathan Stoeckle, an emergency room nurse, to testify about Dubray's condition at a Denver hospital after the murders.

## IV. ANALYSIS

### 1. Trial Court Did Not Err in Admitting Autopsy Photographs

#### (a) Additional Facts

The two law enforcement officers who were first summoned to the house testified about the scene and their observations of the victims' bodies. During one of the officer's testimony, the court admitted into evidence two photographs of the victims' bodies at the scene. A different police officer testified about being present during the autopsies of the victims' bodies. She explained in simple terms the wounds depicted in the nine photographs that the State offered through her testimony. Over Dubray's rule 403 objections, the court admitted the photographs and allowed the State to publish eight of them after the officer testified that they accurately represented what she had seen and photographed.

Later, the pathologist who performed the autopsies testified in more detail about the wounds depicted in five of these photographs, including their depth and trajectory. During the pathologist's testimony, the State withdrew two of the photographs that the court had admitted during the officer's testimony, but submitted 12 additional autopsy photographs. Dubray's attorney did not object to the State's offer of these 12 photographs. The court stated that all the admitted photographs could go to the jury.

(b) Standard of Review

[1,2] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[1] We review the court's admission of photographs of the victims' bodies for abuse of discretion.[2]

(c) Analysis

Dubray contends that many of these photographs were cumulative to other evidence and duplicative of photographs of the victims' wounds that were taken from only slightly different angles. He contends that the court erred in allowing the photographs to go to the jury through both the officer and pathologist, which allowed the State to enhance their prejudicial nature.

[3,4] If the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.[3] In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[4]

Here, the prosecutor stated that he offered the photographs to rebut Dubray's claim of self-defense, to show his intent and malice, to show the positioning and trajectory of the wounds, and to show the position of the bodies as they were found at the scene. Dubray does not contend that the photographs were irrelevant for these purposes. And they were not inadmissible just because crime scene photographs and other testimony established that Dubray had stabbed the victims multiple times.

[5] The crime scene photographs showed the position of the victims' bodies as the officers found them. But they

---

[1] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[2] *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013).

[3] *Id*.

[4] *Smith, supra* note 1.

did not depict the victims' wounds, which was the primary purpose for presenting the autopsy photographs. The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[5] The photographs clearly helped the jurors understand the pathologist's testimony and were highly probative of how the victims died and Dubray's intent and malice in killing them. Given the many times that Dubray stabbed the victims, it is not surprising that the State submitted multiple photographs of their wounds—gruesome crimes produce gruesome photographs.[6]

We agree that the prosecutor could have provided foundation for admitting nine of the photographs without having the police officer verify their authenticity in addition to the pathologist. But rule 403 does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it "substantially" outweighs the probative value of the evidence. Because the court admitted the photographs for a proper purpose, we do not believe that additional photographs of the same wounds were unfairly prejudicial to Dubray. We conclude the court did not abuse its discretion in admitting the exhibits.

## 2. Prosecutorial Misconduct

Dubray contends that the prosecutor asked prejudicial questions of witnesses and made prejudicial comments during his closing argument. He admits that his counsel did not object to the statements, but contends that they constituted plain error.

### (a) Additional Facts

During the State's case in chief, the prosecutor asked Matthew, Chavez' half brother, about his high school activities and school plans. The prosecutor also elicited testimony from the two responding officers about Matthew's shocked reaction upon seeing his father's body.

---

[5] *Abdulkadir, supra* note 2.

[6] *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008).

During Dubray's cross-examination of Reza, Reza stated that when he visited Dubray in the Denver hospital the day after the murders, Dubray had black eyes, "fat lips," and a crooked nose. During the State's redirect examination, the prosecutor presented a photograph of Dubray to Reza. The prosecutor asked whether Reza had any reason to dispute his representation that the photograph was taken 2 days after Reza visited Dubray. After the court sustained Dubray's objection to the prosecutor's improper testimony, the prosecutor tried to ask the question another way: "[I]f I represented to you that it was taken two days after you visited with him, can you explain to us why he doesn't have bruising under his eye?" The court again sustained Dubray's objection to this questioning. The prosecutor then asked Reza whether Dubray was intubated when Reza visited him and whether Reza knew that this procedure could sometimes cause damage to patients. When Dubray objected again, the prosecutor moved on to a different line of questioning.

During the State's initial closing argument, the prosecutor remarked on the victims' attributes and lost future plans:

> Now, I don't — never knew [Chavez], I never knew [Loutzenhiser]. These are two beautiful human beings. They had love in their heart, they had goals, they had aspirations, they had children, they had all of those things in life that people could want. Nothing was perfect but is it ever for any of us? And to have their lives taken from them so savagely, so brutally at 22 years old. And [Loutzenhiser is] never going to his boy's ball games. And [Chavez] to never see her kids again. "Take care of my baby." That's what you are supposed to be doing. That's what she's supposed to be doing. They were killed for no reason. He took their lives and the evidence shows that he did so brutally with premeditation.
>
> Find him guilty of two counts of first degree murder and use of a weapon. The law requires it. And justice demands it. Thank you.

During Dubray's closing argument, his attorney argued that because Dubray was shirtless when he was stabbed, the evidence suggested that Chavez or Loutzenhiser had attacked

him with a knife while he was getting ready for bed. He also argued that Matthew would not still be alive if Dubray had planned the murders and that Matthew was still alive because he was not the one who had attacked Dubray. He suggested that three intoxicated people had simply got into a sudden quarrel and events had turned tragic.

During the State's rebuttal argument, the prosecutor responded to Dubray's argument by stating that Dubray had asked the jury to engage in speculation for which no evidence existed:

> I wish [Loutzenhiser] was here to tell us what happened. I wish [Chavez] was here to get up on the stand and say this is what happened in this case, this is the truth.
>
> . . . .
>
> . . . I'm not going to speculate what would've happened to Matt[hew] if he would've came out earlier . . . apparently [Loutzenhiser] got together with [Chavez] and there's this grand conspiracy for these two much smaller people to attack [Dubray.] But he won't say . . . that [Chavez] tried to cut his throat or stab him. He won't say that [Loutzenhiser] tried to do it. Do you want to know why? Because [his] theory won't hold up. That's why he's doing that. . . . He's throwing it on the walls to see what sticks. . . .
>
> . . . .
>
> [Defense counsel is] up here speculating and he's walking on the graves of these two people. And he wants to do it in an aw-shucks sort of manner. Now, I don't want to really talk badly about these two people . . . but they probably attacked my client and deserved to die. That's what he's saying. . . .
>
> . . . .
>
> . . . I'm surprised [the defense attorney] didn't say that [Matthew] was one of the third conspirators. But maybe that would be pushing it too far.

### (b) Standard of Review

[6-8] A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert

on appeal that the court erred in not declaring a mistrial due to the misconduct.[7] When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error.[8] An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[9] Generally, we will find plain error only when a miscarriage of justice would otherwise occur.[10]

### (c) Analysis

[9,10] Prosecutors are charged with the duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.[11] Because prosecutors are held to a high standard for a wide range of duties, the term "prosecutorial misconduct" cannot be neatly defined. Generally, prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[12]

[11,12] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[13] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[14] But if we conclude that a prosecutor's act were misconduct, we next

---

[7] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[8] See *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

[9] *Id*.

[10] See *id*.

[11] See *id*.

[12] See, *U.S. v. Santos-Rivera*, 726 F.3d 17 (1st Cir. 2013); *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007). See, generally, Bennett L. Gershman, Prosecutorial Misconduct (2d ed. 2013).

[13] See *Watt, supra* note 8.

[14] *Id*.

consider whether the misconduct prejudiced the defendant's right to a fair trial.[15]

[13-15] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.[16] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[17] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.[18]

### (i) Questions to and About Witness Matthew

Dubray argues that the prosecutor improperly asked Matthew about the sports he played in high school and whether he planned to go to homecoming that night. Dubray also argues that the prosecutor asked irrelevant and prejudicial questions of officers about Matthew's shocked reaction to seeing his father's body when he came out of his bedroom.

[16,17] Prosecutors are not to inflame the jurors' prejudices or excite their passions against the accused.[19] This rule includes intentionally eliciting testimony from witnesses for prejudicial effect.[20] Prosecutors should not make statements or elicit testimony intended to focus the jury's attention on the qualities and personal attributes of the victim. These facts lack any relevance to the criminal prosecution and have

---

[15] See *id*.

[16] *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[17] *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

[18] See *Watt, supra* note 8.

[19] See *id*.

[20] *Iromuanya, supra* note 16.

the potential to evoke jurors' sympathy and outrage against the defendant.[21]

But the prosecutor did not violate these rules by questioning Matthew about his high school activities. These questions are distinguishable from the comments that we considered improper in *State v. Iromuanya*.[22] There, the prosecutor remarked about the victims' personal achievements and lost future plans during his opening statement. But here, the prosecutor's questions about Matthew's activities were obviously intended to put a young witness at ease on the witness stand—not to evoke the jurors' sympathy for Matthew as an indirect victim of these crimes. And we reject Dubray's argument that the prosecutor's closing argument affected the innocuous nature of these questions. Because the jury would not have been misled or improperly influenced by these questions, they were not misconduct.

Regarding the prosecutor's questions to officers about Matthew's shocked reaction to seeing his father's body, we agree with the State that this testimony was relevant to eliminate Matthew as a suspect in the jurors' minds. The jurors heard testimony that officers handcuffed Matthew, put him in a patrol car, and took him to the station for questioning. So the questions were relevant to show that although the officers detained Matthew for questioning, he was not a suspect and had nothing to do with the killings. They were not misconduct.

### (ii) Questions to Reza

Dubray also contends that while questioning Reza about Dubray's appearance at the hospital, the prosecutor committed misconduct by persisting in an action that the court had ruled against. He argues that the prosecutor's repeated comments about the photograph of Dubray bolstered his description of it to the jurors and undermined Reza'a testimony. Because the court did not admit the photograph, Dubray contends the

---

[21] *Id.*

[22] *Id.*

jury had no means of determining the truth of the prosecutor's statements.

[18] A prosecutor commits misconduct when he or she persists in attempting to introduce evidence that the court has ruled inadmissible.[23] This prohibition precludes an artful examination that refers directly to the inadmissible evidence.[24] It is true that the court likely would have admitted the photograph if the prosecutor had called a witness to lay foundation for it. But the prosecutor could not do this himself. And the protections against the use of "inadmissible evidence would be of little benefit if the prosecutor were allowed, under the guise of 'artful cross-examination,' to tell the jury the substance of inadmissible evidence."[25] So we agree that the prosecutor's persistence in questioning Reza about the unadmitted photograph and his suggestion that evidence outside the record existed to refute Reza's testimony was misconduct.

But we conclude that the misconduct did not deprive Dubray of a fair trial. We agree that the point of the prosecutor's reference to the unadmitted photograph was to rebut Reza's testimony about Dubray's appearance the day after the murders. But this was a minor scene in a long play, and three other witnesses for Dubray and the trauma surgeon testified about his appearance soon after the murders. So the prosecutor's comments would not have misled or influenced the jurors about Dubray's appearance, particularly when the court sustained Dubray's objections to the photograph and the prosecutor's statements. We conclude that this conduct did not rise to the level of plain error.

### (iii) Prosecutor's Closing Argument

We turn to Dubray's argument that the prosecutor's closing argument was prejudicial because it was intended to appeal to the jurors' sympathies and prejudices and to disparage his

---

[23] See *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998).

[24] See *U.S. v. Hall*, 989 F.2d 711 (4th Cir. 1993). See, also, Annot., 90 A.L.R.3d 646 (1979).

[25] *Hall, supra* note 24, 989 F.2d at 716.

defense counsel. He first argues that in the State's initial summation, the prosecutor's remarks about the victims' qualities and personal attributes were intended to inflame the jury's passions against Dubray. The State does not dispute that the argument was improper, but it points out that the court instructed the jurors that they must not let sympathy or passion influence their verdict.

We conclude that the argument constituted misconduct. As we have explained, a victim's qualities and personal attributes are irrelevant to the facts that the State must prove in a criminal prosecution and have the potential to distort the jurors' reasoned consideration of the evidence by evoking their sympathy for the victim and corresponding outrage toward the defendant.[26] Inflaming those passions appears to have been the prosecutor's intent, and we strongly disapprove of such tactics.

Dubray also contends that during the State's rebuttal argument, the prosecutor improperly "demoniz[ed] the arguments of defense counsel."[27] He argues that although the prosecutor's rebuttal argument was not as egregious as the rebuttal argument in *State v. Barfield*,[28] the effect was the same. The State contends that these statements are distinguishable because the prosecutor was responding to defense counsel's blaming the victims. The State does not argue that the remarks were proper but urges that the jury would have been able to filter out these statements.

In *Barfield*, the prosecutor characterized the defendant as a monster and strongly insinuated that all defense lawyers are liars. We disapproved of the prosecutor's personal expression of the defendant's culpability and especially found his remarks about defense lawyers as being liars to be a serious violation of the prosecutor's duty to ensure a fair trial. We agreed with the 10th Circuit's statement about attributing deceptive

---

[26] *Iromuanya, supra* note 16.

[27] Brief for appellant at 87.

[28] *Barfield, supra* note 12.

motives to a defense counsel personally or to defense law-
yers generally:

> "[C]omments by prosecutors to the effect that a defense
> attorney's job is to mislead the jury in order to garner an
> acquittal for his client is not only distasteful but borders
> on being unethical. . . . Such comments only serve to
> denigrate the legal profession in the eyes of the jury and,
> consequently, the public at large."[29]

[19] We concluded that such comments are misconduct.
We noted that the prosecutor had made numerous improper
remarks and that the defense had no opportunity to respond
to the prosecutor's remarks about defense attorneys because
they were made during rebuttal. We further stated that the
evidence was not overwhelming and that the credibility of
witnesses was a key factor: "[T]he implication that defense
counsel was a liar, and by extension was willing to suborn
perjury, was highly prejudicial when viewed in that context."[30]
We concluded that the remarks were plain error and required
a new trial.

[20] But when a prosecutor's comments rest on reasonably
drawn inferences from the evidence, he or she is permitted to
present a spirited summation that a defense theory is illogical
or unsupported by the evidence and to highlight the relative
believability of witnesses for the State and the defense. These
types of comments are a major purpose of summation, and they
are distinguishable from attacking a defense counsel's personal
character or stating a personal opinion about the character of a
defendant or witness.[31]

[21] So a distinction exists between arguing that a defense
strategy is intended to distract jurors from what the evi-
dence shows, which is not misconduct, and arguing that a
defense counsel is deceitful, which is misconduct. Most of

---

[29] *Id.* at 514, 723 N.W.2d at 314, quoting *U.S. v. Linn*, 31 F.3d 987 (10th Cir. 1994).

[30] *Id.* at 516, 723 N.W.2d at 315.

[31] See, e.g., *U.S. v. Rivas*, 493 F.3d 131 (3d Cir. 2007); *U.S. v. Lore*, 430 F.3d 190 (3d Cir. 2005); *U.S. v. Hartmann*, 958 F.2d 774 (7th Cir. 1992).

the prosecutor's statements fell into the former category and were intended to rebut the defense argument that the evidence showed Dubray had killed the victims in self-defense or upon a sudden quarrel. They were not "foul blow[s]."[32]

But the prosecutor crossed the line when he characterized defense counsel as "walking on the graves of these two people" and arguing that the victims "deserved to die." The latter statement was not a fair characterization of the defense theory, and the former statement amounted to a personal opinion that defense counsel was defiling the victims through misleading and deceptive arguments. The same is true of the prosecutor's statement that he was surprised Dubray's counsel had not attempted to cast Matthew as a third conspirator. These statements do not amount to calling defense attorneys liars. But they were directed at Dubray's counsel personally—not at his arguments. So they were the type of remarks that "'serve to denigrate the legal profession in the eyes of the jury and, consequently, the public at large.'"[33] They have no place in a courtroom and constitute misconduct.

Nonetheless, the prosecutor has dodged a reversal this time. On this record, we cannot conclude that these improper arguments deprived Dubray of a fair trial. Contrary to Dubray's argument, we do not agree that prosecutorial misconduct permeated this trial. Moreover, in addition to the court's admonition not to let sympathy or passion influence the jury's verdict, the court also instructed the jury that the attorneys' statements were not evidence. In another case, these general admonitions might be insufficient to counter the same misconduct. But the State correctly argues that evidence against Dubray was strong and that the credibility of witnesses was not at issue. The most damning evidence of Dubray's guilt

---

[32] *State v. Beeder*, 270 Neb. 799, 805, 707 N.W.2d 790, 795 (2006), *disapproved on other grounds, McCulloch, supra* note 12, quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

[33] *Barfield, supra* note 12, 272 Neb. at 514, 723 N.W.2d at 314, quoting *Linn, supra* note 29.

was his own statements to witnesses who had no reason to lie about them. We conclude that viewing the trial as a whole, the improper arguments did not deprive Dubray of a fair trial. We find no plain error.

### 3. Ineffective Assistance of Counsel

[22] Because Dubray is represented by different counsel in his direct appeal, he must raise any known or apparent claims of his trial counsel's ineffective assistance, or the claim will be procedurally barred in a later postconviction proceeding.[34]

[23,24] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[35] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[36] Counsel's performance was deficient if it did not equal that of a lawyer with ordinary training and skill in criminal law.[37]

[25] To show prejudice from a trial counsel's alleged deficient performance, a defendant must demonstrate a reasonable probability that but for his or her trial counsel's deficient performance, the result of the proceeding would have been different.[38] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[39] We focus on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.[40]

[26] The two components of the ineffective assistance test, deficient performance and prejudice, may be addressed in

---

[34] See *Watt, supra* note 8.

[35] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[36] *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013).

[37] *Iromuanya, supra* note 16.

[38] See *State v. Fox*, 286 Neb. 956, 840 N.W.2d 479 (2013).

[39] *State v. Baker*, 286 Neb. 524, 837 N.W.2d 91 (2013).

[40] See *id*.

either order.[41] If it is more appropriate to dispose of an ineffective assistance claim due to the lack of sufficient prejudice, we follow that course.[42]

### (a) Standard of Review

[27,28] When we review a claim of ineffective assistance of counsel in a postconviction proceeding, it often, but not always,[43] presents a mixed question of law and fact.[44] For "mixed question" ineffective assistance claims, we review the lower court's factual findings for clear error but independently determine whether those facts show counsel's performance was deficient and prejudiced the defendant.[45]

[29,30] But in reviewing claims of ineffective assistance on direct appeal, we are deciding only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?[46] If the alleged ineffective assistance claim rests solely on the interpretation of a statute or constitutional requirement, which claims present pure questions of law, we can decide the issue on direct appeal. Otherwise, we address ineffective assistance claims on direct appeal only if the record is sufficient to review these questions without an evidentiary hearing.[47]

One of Dubray's ineffective assistance claims rests solely on the meaning of a constitutional requirement to exclude involuntary statements from evidence. We turn to that claim first.

---

[41] See *Fox, supra* note 38.

[42] See *Morgan, supra* note 36.

[43] See *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

[44] See *State v. Robinson*, 287 Neb. 799, 844 N.W.2d 312 (2014).

[45] See *State v. Fester*, 287 Neb. 40, 840 N.W.2d 543 (2013).

[46] See *State v. Rocha*, 286 Neb. 256, 836 N.W.2d 774 (2013). Accord, *U.S. v. Henry*, 472 F.3d 910 (D.C. Cir. 2007); *U.S. v. Angel*, 355 F.3d 462 (6th Cir. 2004); *U.S. v. Bender*, 290 F.3d 1279 (11th Cir. 2002).

[47] See *Morgan, supra* note 36.

### (b) Dubray Was Not Prejudiced by His Counsel's
### Failure to Seek Suppression of His
### Incriminating Statements

Relying on *State v. Kula*,[48] Dubray contends that his trial counsel should have moved to suppress Dubray's allegedly involuntary statements to persons who were not law enforcement officers. He contends that under *Kula*, an accused's statement to private citizens—like statements to law enforcement officers—must be voluntary to be admissible at trial. But the State argues that Dubray's position is inconsistent with the U.S. Supreme Court's holding on this issue and our adoption of that holding in other cases. We agree.

In *Colorado v. Connelly*,[49] the U.S. Supreme Court held that coercive police activity is a necessary predicate to a court's finding that a confession is not voluntary under the Due Process Clause. There, the defendant, who suffered from chronic schizophrenia, walked into a police station and confessed to a murder committed several months earlier. A state psychiatrist opined that he had confessed to the murder while experiencing "'command hallucinations'" from the "'voice of God,'" raising the issue whether his confession was voluntary.[50] The state appellate court affirmed the suppression of the confession. The U.S. Supreme Court reversed because there was no evidence that the police officers had exploited a mental weakness with coercive tactics:

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. . . .
>
>    . . . [W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.

---

[48] *State v. Kula*, 260 Neb. 183, 616 N.W.2d 313 (2000).

[49] *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

[50] *Id.*, 479 U.S. at 161.

Our "involuntary confession" jurisprudence is entirely consistent with the settled law requiring some sort of "state action" to support a claim of violation of the Due Process Clause . . . .[51]

[31] The Court specifically held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[52] We have stated this holding in several cases.[53]

But in 1985, a year before the U.S. Supreme Court decided *Connelly*, we decided *State v. Bodtke*.[54] In *Bodtke*, we agreed with other state courts that an accused's incriminating statement to a private citizen must be voluntary to be admissible: "On questioned voluntariness, an accused's statement, whether an admission or a confession, made to private citizens, as well as to law enforcement personnel, must be voluntary as determined by a court for admissibility and as a fact ascertained by the jury."[55] We reasoned that the State's "[u]se of an accused's involuntary statement, whether admission or confession, offends due process and fundamental fairness in a criminal prosecution, because one acting with coercion, duress, or improper inducement transports his volition to another who acts in response to external compulsion, not internal choice."[56]

Later, in *State v. Phelps*,[57] we cited a criminal law treatise that called into question our holding in *Bodtke* in light of the

---

[51] *Id.*, 479 U.S. at 164-65.

[52] *Id.*, 479 U.S. at 167.

[53] See, e.g., *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011); *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010); *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000); *State v. Ray*, 241 Neb. 551, 489 N.W.2d 558 (1992), *abrogated on other grounds*, *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[54] *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985).

[55] *Id.* at 513, 363 N.W.2d at 923.

[56] *Id.* at 510, 363 N.W.2d at 922.

[57] See *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992), citing 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2 n.77.2 (Supp. 1991).

*Connelly* decision. But we concluded that it was unnecessary for us to resolve whether the *Bodtke* rule was still viable in Nebraska because the defendant's statements to private citizens were voluntarily made.

In *Kula*,[58] on which Dubray relies, we had previously reversed the defendant's convictions, because of prosecutorial misconduct, and remanded the cause for a new trial. At the defendant's retrial, a fellow inmate testified about incriminating statements that the defendant had made in prison after he was convicted in the first trial. The defendant requested a hearing to determine whether his statements were voluntary, but the court never ruled on the issue. On appeal, he assigned that the court erred in denying his request for a hearing. He claimed that his incriminating statements resulted from the State's improper influence, i.e., the stress, anxiety, and coercive environment that he allegedly experienced because prosecutorial misconduct had caused his wrongful conviction. Relying on *Bodtke*, we held that the trial court erred in failing to make a preliminary determination whether the defendant's statements were voluntary before admitting the inmate's testimony about the content of his statements.

As noted, however, in several cases, we have recognized that the Due Process Clause of the U.S. Constitution does not exclude an involuntary statement unless coercive police activity was involved in obtaining it. Even the "most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause"[59]:

> We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum . . . and not the Due Process Clause of the

---

[58] *Kula, supra* note 48.

[59] *Connelly, supra* note 49, 479 U.S. at 166.

Fourteenth Amendment. "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false."[60]

We recognize that incriminating statements obtained through a private citizen's coercion or duress raise an obvious concern about their reliability.[61] But to date, the Supreme Court has interpreted the Due Process Clause to exclude only involuntary statements improperly obtained through the coercive conduct of state actors—not "'presumptively false evidence'"[62] that was not obtained through the coercion of any state actor. Moreover, a statement allegedly obtained solely by private citizens through coercion or duress could be challenged under rule 403[63] as inadmissible because the danger of prejudice outweighs any probative value.[64] Even if a court did not exclude the statement, the existence of coercion or duress in obtaining it would clearly present a jury question whether the statement was reliable evidence of the fact at issue.

[32,33] Here, Dubray does not contend that he made his incriminating statements in response to a private citizen's coercion or duress. Most of his statements were not even made in response to a question. But we conclude that Nebraska's requirement that a defendant's incriminating statements to private citizens must be voluntary to be admissible is incorrect under established due process precedents. We have held that the due process protections of the Nebraska Constitution are coextensive with the protections afforded by the Due Process Clause of the U.S. Constitution.[65] And, as stated, we have cited the *Connelly* holding in many cases. We therefore overrule

---

[60] *Id.*, 479 U.S. at 167 (citations omitted).

[61] See *Phelps, supra* note 57.

[62] See *Connelly, supra* note 49, 479 U.S. at 167.

[63] See § 27-403.

[64] Compare *Boren v. Sable*, 887 F.2d 1032 (10th Cir. 1989).

[65] See, *Keller v. City of Fremont*, 280 Neb. 788, 790 N.W.2d 711 (2010); *State v. Thomas*, 268 Neb. 570, 685 N.W.2d 69 (2004).

*Bodtke*[66] and *Kula*[67] to the extent that they hold due process precludes the admission of a defendant's involuntary statement to a private citizen. A defendant should challenge incriminating statements allegedly procured through a private citizen's coercion or duress under rule 403.

It is true that we had not overruled *Bodtke* and *Kula* when Dubray was tried, and we will assume for this analysis that his trial counsel was deficient in failing to request a preliminary hearing on the voluntariness of Dubray's statements. Even if this assumption were true, however, Dubray cannot show prejudice under *Strickland* because he is not entitled to the benefit of an incorrect ruling on due process requirements. The U.S. Supreme Court addressed this issue in *Lockhart v. Fretwell*.[68]

In *Fretwell*, the petitioner in a federal habeas corpus action had been convicted of capital murder in state court and sentenced to death by a jury. The prosecutor had argued that the evidence established two aggravating factors. The petitioner claimed that his trial counsel was ineffective for failing to raise an Eighth Circuit case, decided 8 months before his trial, that would have rendered the aggravators invalid. Three years after the petitioner's trial, the U.S. Supreme Court decided a case that resulted in the Eighth Circuit's overruling its case which had invalidated the aggravators.[69] The federal district court recognized that after the judgment was affirmed on appeal, the Eighth Circuit had overruled the case supporting the petitioner's claim.[70] But because the law was in effect at his trial, the district court concluded that trial counsel was ineffective in failing to raise it. The court concluded that the

---

[66] *Bodtke, supra* note 54.

[67] *Kula, supra* note 48.

[68] *Lockhart v. Fretwell*, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).

[69] See *Fretwell v. Lockhart*, 946 F.2d 571 (8th Cir. 1991), *reversed, Fretwell, supra* note 68.

[70] See *Fretwell v. Lockhart*, 739 F. Supp. 1334 (E.D. Ark. 1990), *reversed, Fretwell, supra* note 68.

prejudice was obvious because without a valid aggravator, the petitioner would have been sentenced to life in prison. The Eighth Circuit affirmed, reasoning that the petitioner was entitled to the benefit of a decision that was still in effect at the time of his sentencing.

The U.S. Supreme Court disagreed and reversed. The Court emphasized that the prejudice component of the *Strickland* test is not simply a question of whether the outcome would have been different:

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.[71]

[34] The Court rejected the petitioner's reliance on the rule that ineffective assistance claims are not judged from hindsight. It explained that this rule applies under the deficient performance component of *Strickland*, not the prejudice component. It concluded that under *Strickland*, a defendant is not prejudiced by an error that deprives the defendant "'of the chance to have the state court make an error in his [or her] favor.'"[72]

The U.S. Supreme Court has clarified that *Fretwell* did not modify or supplant the *Strickland* test for ineffective assistance.[73] Instead, in *Williams v. Taylor*,[74] the Court classified *Fretwell* as one of the unusual situations "in which it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'"[75] "[G]iven the overriding interest in fundamental fairness, the likelihood of a different outcome

---

[71] *Fretwell, supra* note 68, 506 U.S. at 369-70.

[72] *Id.*, 506 U.S. at 371.

[73] See *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).

[74] *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

[75] *Id.*, 529 U.S. at 391-92.

attributable to an incorrect interpretation of the law should be regarded as a potential 'windfall' to the defendant rather than the legitimate 'prejudice' contemplated by . . . *Strickland*."[76] But *Fretwell* does "not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him."[77]

Dubray's claim clearly falls within *Fretwell*'s windfall circumstance. The only distinction between *Fretwell* and the history here is that we had not previously overruled *Bodtke* and *Kula* before deciding his ineffective assistance claims. But that distinction is immaterial. The point under *Fretwell* is that the relief Dubray requests rests upon an incorrect judicial interpretation of constitutional law. *Connelly* has been the final word on this issue since 1986, and *Bodtke* and *Kula* are both incorrect under *Connelly*. So under *Fretwell*, Dubray asks for a windfall to which he is not entitled—an incorrect state court ruling on due process requirements. Because he cannot establish *Strickland* prejudice, his ineffective assistance claim is without merit.

### (c) Dubray Was Not Prejudiced by His Counsel's Failure to Request an Intoxication Instruction or Challenge the Constitutionality of § 29-122

Dubray contends that his trial counsel was ineffective in failing to (1) ask the court to instruct the jury that voluntary intoxication can negate specific intent of the charged crimes and (2) challenge the constitutionality of § 29-122. Dubray argues that this court has long recognized a defendant's voluntary intoxication as a defense if it would negate the intent element of a specific intent crime. He recognizes that in 2011, the Legislature enacted § 29-122,[78] which, in most circumstances, eliminates voluntary intoxication as a defense and precludes its consideration in determining the existence of a mens rea requirement:

---

[76] *Id.*, 529 U.S. at 392.

[77] *Id.*, 529 U.S. at 393 (emphasis in original).

[78] See 2011 Neb. Laws, L.B. 100 (effective Aug. 27, 2011).

A person who is intoxicated is criminally responsible for his or her conduct. Intoxication is not a defense to any criminal offense and *shall not be taken into consideration in determining the existence of a mental state that is an element of the criminal offense unless* the defendant proves, by clear and convincing evidence, that he or she did not (1) know that it was an intoxicating substance when he or she ingested, inhaled, injected, or absorbed the substance causing the intoxication or (2) ingest, inhale, inject, or absorb the intoxicating substance voluntarily.

(Emphasis supplied.)

But Dubray contends that his counsel should have challenged § 29-122 because its application violated his right to due process. Dubray argues that the preclusion of an intoxication defense relieved the State of its burden to prove his mental state beyond a reasonable doubt and shifted the burden to him to prove that his crimes were not premeditated. He recognizes that in 1996, the U.S. Supreme Court upheld a similar statute in *Montana v. Egelhoff*.[79] But he contends that the decision was limited by Justice Ginsburg's reasoning in her concurring opinion because without her concurrence, the opinion would have split equally between the plurality and the dissent. He cites to the U.S. Supreme Court's rule that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"[80] Dubray contends that § 29-122 is unconstitutional under the reasoning of the concurring opinion in *Egelhoff* because it limits the admissibility of relevant evidence instead of redefining the elements of the crime.

---

[79] *Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996).

[80] See *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977).

We decline to address the constitutionality of § 29-122 here because it is unnecessary to deciding this appeal.[81] Even under the common-law rule that intoxication can be a defense in limited circumstances, we conclude that Dubray was not entitled to an intoxication instruction as a matter of law.

[35] Under Nebraska common law, intoxication is not a justification or excuse for a crime, but it may be considered to negate specific intent.[82] To submit this defense to the jury, however, the defendant must not have become intoxicated to commit the crime and, because of the intoxication, must have been rendered wholly deprived of reason.[83] The excessive intoxication must support a conclusion that the defendant lacked the specific intent to commit the charged crime.[84] The evidence did not support that finding here.

Contrary to Dubray's argument, there is no evidence in the record to show that his blood alcohol concentration was at least .221 of a gram. During the State's examination of the trauma surgeon at the emergency room, the following exchange occurred:

> [Prosecutor:] What was [Dubray's] blood alcohol level in the tox screen that you did?
>
> [Surgeon:] I don't recall the number off hand but it would be in the chart.
>
> [Prosecutor:] If I represent to you that your chart says it was a .221, would you have any reason to dispute that?
>
> [Surgeon:] I wouldn't dispute it, no.

But the prosecutor's unsworn factual assertion was not evidence, absent a showing that the parties stipulated to this fact. And the surgeon's statement that he could not dispute the prosecutor's representation did not magically transform it into evidence. Dubray also points to evidence of the victims' blood alcohol concentrations. But the pathologist testified

---

[81] See *State v. Johnson*, 269 Neb. 507, 695 N.W.2d 165 (2005).

[82] *State v. Hotz*, 281 Neb. 260, 795 N.W.2d 645 (2011).

[83] See *id.*, citing *Tvrz v. State*, 154 Neb. 641, 48 N.W.2d 761 (1951).

[84] See, *State v. Bevins*, 187 Neb. 785, 194 N.W.2d 181 (1972); *State v. Brown*, 174 Neb. 393, 118 N.W.2d 332 (1962).

that the higher concentrations found in the victims' vitreous eye fluid was not necessarily more accurate, and no evidence suggested that Dubray's concentration would have been comparable to the victims' concentrations.

More important, the evidence shows that Dubray was not wholly deprived of reason immediately before or after the murders. As explained, Dubray, Chavez, and Loutzenhiser walked back to Dubray's house around 6 a.m. No witness testified that Dubray was behaving unreasonably at his aunt's house at this time. By 6:49 a.m., Dubray had killed Chavez and Loutzenhiser and called Reza to take care of his child. By the time Reza arrived a few minutes later, Dubray had also attempted suicide for the first time. But his concern for his daughter and his conduct after the murders showed he was contemplating how to respond to his imminent arrest. He specifically told Marco and Reza that he intended to kill himself to avoid prison, and he insisted that they not call Little Hoop so that he could carry out this plan. He was clearly reasoning and anticipating the consequences of the acts he had just committed.

Because the record shows that Dubray's consumption of alcohol did not wholly deprive him of reason, he would not have been entitled to an intoxication instruction even under our common-law rules. So he cannot show prejudice from his counsel's failure to seek an intoxication instruction or to challenge the constitutionality of § 29-122.

### (d) Dubray Was Not Prejudiced by His Counsel's Failure to Object to Jury Instruction Defining Sudden Quarrel

[36] Dubray's trial counsel did not object to instruction No. 4, which included a definition of sudden quarrel. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.[85] But Dubray claims that his trial counsel provided

---

[85] *Abdulkadir, supra* note 2.

ineffective assistance in failing to object to the italicized language in the following definition:

> **A sudden quarrel** is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self[-]control. It does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent. The question is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment. *The test is an objective one. Qualities peculiar to the defendant which render him or her particularly excitable, such as intoxication, are not considered.*

This instruction is consistent with our recent definitions of a sudden quarrel.[86] But Dubray contends that his intoxication was relevant to whether he was capable of reflection and reasoning. He further argues that the instruction undermined his trial counsel's argument that his intoxication prevented him from forming the requisite intent to kill. We reject these arguments. We have already determined that Dubray was not entitled to an intoxication instruction. Moreover, his trial counsel's intoxication argument was not relevant to a sudden quarrel defense.

[37,38] Voluntary manslaughter is an intentional killing committed under extenuating circumstances that mitigate, but do not justify or excuse, the killing.[87] Even apart from the

---

[86] See, e.g., *id.*; *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012).

[87] See *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011).

language that Dubray challenges, our consistent references to a "reasonable person" in defining a sudden quarrel shows that we require an objective standard for determining whether the evidence shows a sufficient provocation that would cause a loss of self-control. The reasonable person test is a reference to a hypothetical ordinary person.[88]

[39,40] Other courts agree with us that intoxication is not relevant in determining the reasonableness of a defendant's response to a claimed provocation.[89] Because the defendant has intentionally killed another person, an objective reasonable person test is the appropriate means of determining whether the law should recognize the circumstances as warranting a reduction from murder to manslaughter. The concept of manslaughter is a concession to the frailty of human nature, but it was not intended to excuse a defendant's subjective personality flaws.[90] We conclude that Dubray's trial counsel was not ineffective for failing to object to the court's definition of sudden quarrel.

### (e) Dubray Was Not Prejudiced by His Counsel's Failure to Object to Every Photograph of the Victims' Bodies

Dubray argues that to the extent his trial counsel failed to preserve the issue of the court's admission of photographs of the victims' bodies, he provided ineffective assistance. As discussed, however, Dubray's counsel did object to the admission of photographs during the police officer's testimony. And we have concluded that the court did not abuse its discretion in admitting additional and similar photographs and that the additional photographs did not unfairly prejudice Dubray. So Dubray cannot show that he was prejudiced by his trial court's failure to object to the court's rulings.

---

[88] See Black's Law Dictionary 1457 (10th ed. 2014).

[89] See, e.g., *People v. Manriquez*, 37 Cal. 4th 547, 123 P.3d 614, 36 Cal. Rptr. 3d 340 (2005); *Commonwealth v. Garabedian*, 399 Mass. 304, 503 N.E.2d 1290 (1987); *Bland v. State*, 4 P.3d 702 (Okla. Crim. App. 2000); *Com. v. Bridge*, 495 Pa. 568, 435 A.2d 151 (1981).

[90] See *Smith, supra* note 87.

### (f) Dubray Was Not Prejudiced by His Counsel's Failure to Object to the Prosecutor's Closing Argument and Questioning of Witnesses

[41] Dubray argues that his trial counsel's performance was deficient to the extent that he failed to preserve Dubray's claims of prosecutorial misconduct by failing to object to the conduct. But in determining whether a defense counsel's failure to object to prosecutorial misconduct rendered the trial unreliable or unfair, we consider whether the defendant's right to a fair trial was prejudiced because of the prosecutorial misconduct.[91] We have determined that Dubray's claims of prosecutorial misconduct are without merit or that he was not deprived of a fair trial because of the prosecutor's misconduct. So Dubray cannot show prejudice from his trial counsel's failure to object to the conduct.

### (g) The Record is Insufficient to Evaluate Trial Counsel's Failure to Call Megan Reza as a Witness

Dubray contends that his trial counsel should have called Megan Reza, who was one of Dubray's cousins, as a witness. He argues that Megan Reza was also a friend of Chavez and would have testified that Chavez kept a knife hidden under her mattress for protection. He contends that her testimony would have helped to negate the premeditation charge and support his theory of self-defense or sudden quarrel. We agree with the State that the claim requires an evaluation of trial strategy, for which the record is insufficient. We decline to address it on direct appeal.

### (h) Dubray Was Not Prejudiced by His Counsel's Failure to Subpoena an Out-of-State Witness

During the trial, the court sustained the State's objection to admitting a deposition of Stoeckle, an emergency room nurse at the Denver hospital where Dubray was treated. Stoeckle had described Dubray's injuries in a report. The court excluded

---

[91] See *Iromuanya, supra* note 16.

the deposition because Dubray had not shown that Stockle was unavailable.

Dubray contends that his trial counsel's performance was deficient in failing to subpoena Stoeckle to testify about his injuries. He argues that his trial counsel could have subpoenaed Stoeckle under Neb. Rev. Stat. § 29-1908 (Reissue 2008). Dubray contends he was prejudiced by his counsel's misunderstanding of the law because Stoeckle could have provided an unbiased account of Dubray's condition—as distinguished from the descriptions provided by family members. He argues Stoeckle's testimony would have rebutted the State's evidence that all his wounds were self-inflicted or illusory.

The State disagrees that Dubray could have subpoenaed Stoeckle under § 29-1908. It argues that Dubray cannot show a reasonable probability that the outcome would have been different even if Stoeckle had testified. Because we agree that Dubray cannot show prejudice from not having Stoeckle testify, we do not address whether his counsel's performance was deficient.

No offer of proof was made at trial about the substance of Stoeckle's statements. But Dubray's description of Stoeckle's potential testimony shows that Stoeckle's absence from the trial is insufficient to undermine confidence in its outcome. As stated, Dubray's family members testified about his appearance at the hospital. Moreover, the trauma surgeon at the Nebraska emergency room testified to all of Dubray's injuries. So Dubray has not shown the necessity of having another non-family member testify to his injuries. We conclude that this claim is without merit.

## V. CONCLUSION

We conclude that the court did not err in admitting the autopsy photographs. We conclude that Dubray's claims of prosecutorial misconduct are without merit or that he was not prejudiced by the misconduct. Accordingly, Dubray cannot show prejudice from his trial counsel's failure to object to

these alleged trial errors. We conclude that his trial counsel was not ineffective for failing to seek suppression of his statements to private citizens. We conclude that under the common law, he was not entitled to an intoxication defense. We therefore do not address his challenges to § 29-122. We conclude that his ineffective assistance claims either fail or cannot be addressed on direct appeal. We affirm.

AFFIRMED.

MILLER-LERMAN, J., concurring in the result.

I concur in the result, but respectfully disagree with the breadth of the majority opinion regarding the interplay between voluntariness of admissions and due process, specifically, the failure of the majority opinion to analyze Dubray's hospital statement made to a private citizen. I disagree with the majority's apparent conclusion that Dubray's hospital statement, arguably coerced by State action but made to a private citizen, is not subject to a due process challenge.

Dubray claims that counsel was ineffective for failing to challenge certain of his statements on due process grounds. The statements were made in two contexts: at Dubray's home and when Dubray was in the hospital. The set of statements at the home were made to private citizens before the police arrived. I agree with the majority that there was no coercion by the State or private person and that hence, no due process hearing was required.

However, Dubray also made a statement to Carlos Reza after Dubray was in custody, when Dubray was sedated in the hospital and restrained to the bed with "little white straps." Dubray claims the hospital statement was involuntary, but the majority does not explain how this statement fits within its holding. Where the coercive circumstances are created by the State or where there is a private citizen acting in concert with the State, or as a state agent, statements to a private citizen should be considered for due process review.

However, whether or not the hospital statement would be subject to a due process voluntariness challenge, I note that the statement would be cumulative of the prior statements

not subject to such a challenge. Therefore, Dubray could not show prejudice from counsel's purported failure to challenge the hospital statement. Thus, I agree with the majority that Dubray has not shown ineffective assistance of counsel regarding his various admissions.

Wright, J., joins in this concurrence.

———————————

State of Nebraska on behalf of Connor H., a minor child, appellee, v. Blake G., appellee, and Amanda H., now known as Amanda G., third-party defendant and appellant.

In re Change of Name of Connor H., by and through his next friend, Amanda G. Amanda G., appellant, v. Blake G., appellee.

___ N.W.2d ___

Filed October 10, 2014.    Nos. S-13-995, S-13-1000.

1. **Minors: Names: Appeal and Error.** An appellate court reviews a trial court's decision concerning a requested change in the surname of a minor de novo on the record and reaches a conclusion independent of the findings of the trial court.
2. **Minors: Names.** The question of whether the name of a minor child should be changed is determined by what is in the best interests of the child.
3. **Minors: Names: Proof.** The party seeking the change in surname has the burden of proving that the change in surname is in the child's best interests.
4. **Minors: Names.** Substantial welfare is related to best interests, because a change in surname is in a child's best interests only when the substantial welfare of the child requires the name to be changed.
5. ____: ____. In Nebraska, there is no preference for a surname—paternal or maternal—in name change cases; rather, the child's best interests is the sole consideration.
6. ____: ____. Nonexclusive factors to consider in determining whether a change of surname is in a child's best interests are (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit.