State of Nebraska, appellee, v.
Mohamed Abdulkadir, appellant.
___ N.W.2d ___

Filed August 2, 2013.    No. S-12-893.

1.  **Appeal and Error.** An appellate court may, at its option, notice plain error.
2.  **Appeal and Error: Words and Phrases.** In determining plain error, where the law at the time of trial was settled and clearly contrary to the law at the time of the appeal, it is enough that an error be "plain" at the time of appellate consideration.
3.  **Trial: Photographs.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.
4.  **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.
5.  **Sentences: Appeal and Error.** Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.
6.  **Jury Instructions: Appeal and Error.** Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.
7.  **Homicide: Words and Phrases.** A sudden quarrel is a legally recognized and sufficient provocation that causes a reasonable person to lose normal self-control.
8.  ____: ____. A sudden quarrel does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.
9.  **Homicide: Intent.** The question when determining whether a killing was upon a sudden quarrel is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.
10.  **Homicide: Lesser-Included Offenses.** Although voluntary manslaughter is a lesser degree of homicide, it is not a lesser-included offense of second degree murder under the elements test, because it is possible to commit second degree murder without committing voluntary manslaughter; one who intentionally kills another without premeditation and without the provocation of a sudden quarrel commits second degree murder, but does not simultaneously commit manslaughter.
11.  **Homicide: Lesser-Included Offenses: Jury Instructions.** Where there is evidence that (1) a killing occurred intentionally without premeditation and (2) the defendant was acting under the provocation of a sudden quarrel, a jury must be given the option of convicting of either second degree murder or voluntary manslaughter depending upon its resolution of the fact issue regarding provocation.
12.  **Homicide: Photographs.** Although the probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are

admitted, if the photographs illustrate or make clear some controverted issue in a homicide case, proper foundation having been laid, they may be received, even if gruesome.

13. **Criminal Law: Evidence.** A defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.

14. ____: ____. The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

15. **Criminal Law: Sentences.** There is no statutory requirement that the affirmatively stated minimum term for a Class IB felony sentence be less than the maximum term, and although Neb. Rev. Stat. § 29-2204(1)(a)(ii) (Cum. Supp. 2012) permits a sentencing judge imposing a maximum term of life imprisonment for a Class IB felony to impose a minimum term of years not less than the statutory mandatory minimum, it does not require the judge to do so.

16. **Homicide: Sentences.** A life-to-life sentence for second degree murder is a permissible sentence under Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2012).

17. **Statutes: Judicial Construction: Legislature: Presumptions: Intent.** When judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation.

Appeal from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed.

James R. Mowbray and Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

McCormack, J.

## I. NATURE OF CASE

Mohamed Abdulkadir was found guilty of second degree murder and use of a deadly weapon to commit a felony for the death of Michael Grandon. The district court sentenced Abdulkadir to a term of imprisonment of life to life for the second degree murder conviction and to a consecutive term of imprisonment of 15 to 25 years for the use of a deadly weapon conviction. Abdulkadir now appeals and alleges the district court erred in giving incorrect jury instructions, in admitting cumulative and gruesome photographs, and in sentencing him to a term of imprisonment of life to life.

## II. BACKGROUND

Abdulkadir was incarcerated at the Nebraska State Penitentiary on June 30, 2011. On that day, Abdulkadir was working in a prison facility when he was informed by other inmates that his prison cell had been robbed. Abdulkadir immediately left work and returned to his cell.

Abdulkadir returned to find that his television, headphones, compact disc player, various clothing items, prayer oils, and toiletries were missing from his cell. Abdulkadir notified caseworker Cody Eastman that his items had been stolen. Eastman told Abdulkadir to file a report.

Instead of filing the report, Abdulkadir, accompanied by his friends, began asking other inmates if they knew anything about the theft. From his questions, Abdulkadir determined that inmate Grandon was a possible suspect. Abdulkadir approached Grandon in the prison gymnasium and questioned him as to his possible involvement in the theft. Grandon swore "on his hood" that he was not involved. At trial, a prisoner testified that Abdulkadir was nonthreatening toward Grandon during the questioning.

After questioning Grandon, Abdulkadir briefly returned to his cell. At that time, Abdulkadir noticed that Grandon had also returned. Abdulkadir testified that as he was leaving his cell, he was "sucker punche[d]" above his left eye by Grandon. Both men engaged in a struggle, and according to Abdulkadir, Grandon pulled a knife out of his pocket. Abdulkadir was able to gain control of the knife as Grandon placed him in a choke hold. Abdulkadir testified that he then stabbed Grandon multiple times in self-defense.

Corporal Henry McFarland was stationed in the "bubble," an observation control center down the hall from where Grandon was stabbed. Just before the stabbing, four inmates stood shoulder to shoulder blocking McFarland's view from the bubble. McFarland had never seen inmates stand like that before and asked them through the intercom system to move. The inmates said they were trimming each other's hair and slowly dispersed after McFarland commanded them to move.

As the inmates moved away, McFarland heard someone yelling for help. McFarland did not see a knife at that point

and radioed that a fight with no weapons was in progress. McFarland looked down the hallway and saw Grandon fall to the floor. Abdulkadir was standing over Grandon, swinging his arm in a downward motion, and McFarland then saw the knife. McFarland testified that as Abdulkadir was standing over Grandon, McFarland heard Abdulkadir state, "'You think you can steal from me?'"

Eastman was the first to respond to the fight. When he arrived, he caught a glimpse of the knife and radioed that a weapon was involved and that more personnel would be needed. Abdulkadir was making thrusting motions toward Grandon. Eastman told Abdulkadir that it was over and to drop the weapon. Abdulkadir complied, and Eastman detained him. Medical attention was given to Grandon, but he later died.

After being detained, Abdulkadir was sent to segregation. Corporal Fawn Swisher was in the control room in the segregation unit. She overheard all of the inmates in segregation asking Abdulkadir what he did to be placed in segregation. Swisher turned on the speaker box for Abdulkadir's cell to gather information. Swisher overheard Abdulkadir telling the other inmates that "somebody was stealing his shit and he couldn't let that happen and that he'd do it again."

## 1. Autopsy Photographs

Dr. Jean Thomsen, a pathologist, performed the autopsy on Grandon. Thomsen testified that in her opinion, the cause of Grandon's death was the infliction of multiple "cutting and stab wounds to his neck, chest, posterior, abdomen, and buttocks." During her testimony, the State offered, over the defense counsel's objections, exhibits 36 through 48, 50, and 51. The exhibits are 15 photographs depicting all 25 stab wounds to Grandon's body.

Prior to Thomsen's testimony, the district court held a hearing on the autopsy photographs. Counsel for Abdulkadir offered to stipulate to the content of the photographs. He argued that publishing all 15 photographs would be cumulative and would unnecessarily inflame the jury. The district court asked defense counsel: "I take it [defense counsel] is still requiring the State

to prove a lack of self-defense, is that right?" To which defense counsel answered in the affirmative.

The State argued that the wounds, including the wounds to Grandon's arms and hands, were consistent with defensive wounds. The district court found the exhibits not cumulative and found each exhibit to be relevant on the issue of self-defense.

## 2. Jury Instructions

During the jury instruction conference, Abdulkadir proposed jury instructions for first degree murder, second degree murder, and manslaughter. The district court accepted those instructions with minor changes. Abdulkadir did not object to the final instructions, which were as follows:

### COUNT I:
### MURDER IN THE FIRST DEGREE

Under Count I of the Indictment in this case, depending on the evidence, you may return one of four possible verdicts. You may find Mohamed Abdulkadir:

1. Guilty of murder in the first degree; or
2. Guilty of murder in the second degree; or
3. Guilty of manslaughter; or
4. Not guilty

### A. ELEMENTS
### 1. Murder in the first degree.

The elements which the State must prove by evidence beyond a reasonable doubt in order to convict Mr. Abdulkadir of murder in the first degree are:

(1) That Mr. Abdulkadir killed Michael Grandon;

(2) That Mr. Abdulkadir did so purposely;

(3) That Mr. Abdulkadir did so with deliberate and premeditated malice;

(4) That Mr. Abdulkadir did not do so as the result of a sudden quarrel;

(5) That Mr. Abdulkadir did not do so in self-defense;

(6) That Mr. Abdulkadir did so on or about June 30, 2011; and

(7) That Mr. Abdulkadir did so in Lancaster County.

. . . .

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing elements, and this burden never shifts.

## 2. Murder in the second degree.

The elements which the State must prove by evidence beyond a reasonable doubt in order to convict Mr. Abdulkadir of murder in the second degree are:

(1) That Mr. Abdulkadir killed Michael Grandon;

(2) That Mr. Abdulkadir did so intentionally;

(3) That Mr. Abdulkadir did not do so as the result of a sudden quarrel;

(4) That Mr. Abdulkadir did not do so in self-defense;

(5) That Mr. Abdulkadir did so on or about June 30, 2011; and

(6) That Mr. Abdulkadir did so in Lancaster County.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing elements, and this burden never shifts.

## 3. Manslaughter.

The elements which the State must prove by evidence beyond a reasonable doubt in order to convict Mr. Abdulkadir of manslaughter are:

(1) That Mr. Abdulkadir killed Michael Grandon;

(2) That Mr. Abdulkadir did so intentionally upon a sudden quarrel;

(3) That Mr. Abdulkadir did not do so in self-defense;

. . . .

(4) That Mr. Abdulkadir did so on or about June 30, 2011; and

(5) That Mr. Abdulkadir did so in Lancaster County.

The State has the burden of proving beyond a reasonable doubt each and every one of the foregoing elements, and this burden never shifts.

## B. EFFECTS OF FINDINGS

You must separately consider in the following order the crimes of first degree murder, second degree murder, and manslaughter. For the crime of first degree murder, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove

each element, then you must find Mr. Abdulkadir guilty of murder in the first degree and proceed no further on Count I. If you find that the State did not so prove, then you must proceed to consider the crime of second degree murder.

For the crime of second degree murder, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Mr. Abdulkadir guilty of murder in the second degree and proceed no further on Count I. If you find the State did not so prove, then you must proceed to consider the crime of manslaughter.

For the crime of manslaughter, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Mr. Abdulkadir guilty of manslaughter. If you find the . . . State did not so prove, then you must find Mr. Abdulkadir not guilty of all charges under Count I.

Although your final verdict must be unanimous, during your preliminary deliberations and discussions, you are not required to be unanimous before considering whether Mr. Abdulkadir is guilty of a lesser offense (i.e., second degree murder or manslaughter.)

The jury found Abdulkadir guilty of second degree murder and use of a deadly weapon to commit a felony. The district court sentenced Abdulkadir to a term of imprisonment of life to life for the second degree murder conviction and to a consecutive term of imprisonment of 15 to 25 years for the use of a deadly weapon conviction. Abdulkadir now appeals.

## III. ASSIGNMENTS OF ERROR

Abdulkadir argues, restated and summarized, that the district court erred by (1) denying a requested instruction that the State prove beyond a reasonable doubt that Abdulkadir did not act in a state of passion upon sudden provocation, (2) using a second degree murder step instruction that did not require the jury to consider the elements of both crimes with the option for convicting Abdulkadir of manslaughter, (3) allowing the admission of cumulative gruesome autopsy photographs, and

(4) sentencing Abdulkadir to "life to life," because such sentence is a determinate sentence which invades and usurps the province of the Legislature.

## IV. STANDARD OF REVIEW

[1,2] An appellate court may, at its option, notice plain error.[1] In determining plain error, where the law at the time of trial was settled and clearly contrary to the law at the time of the appeal, it is enough that an error be "plain" at the time of appellate consideration.[2]

[3] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[3]

[4] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.[4]

[5] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.[5]

## V. ANALYSIS

### 1. JURY INSTRUCTIONS

[6] On appeal, Abdulkadir argues that the jury instructions were incorrect. However, Abdulkadir did not object at trial to the jury instructions that he now assigns as error. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.[6] Therefore, we will review both of his assignments of error concerning the jury instructions for plain error.

---

[1] See *State v. Nadeem*, 284 Neb 513, 822 N.W.2d 372 (2012).

[2] *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012).

[3] *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

[4] *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

[5] *Id*.

[6] *State v. Watt*, 285 Neb. 647, ___ N.W.2d ___ (2013).

### (a) Sudden Quarrel Versus "Heat of Passion on Sudden Provocation"

Abdulkadir argues that under *Mullaney v. Wilbur*,[7] the Due Process Clause of the U.S. Constitution requires that the prosecution prove beyond a reasonable doubt the absence of the "'heat of passion on sudden provocation'" when the issue is properly presented in a homicide case.[8] He argues that the exact language "heat of passion on sudden provocation" is required and the use of only "sudden quarrel" in the jury instructions constituted plain error.[9] We disagree.

In *Mullaney*, the U.S. Supreme Court was addressing a Maine statute that required the defendant to prove that he acted in the heat of passion on sudden provocation, in order to reduce a charge from second degree murder to manslaughter.[10] The Court held that placing the burden of proof with the defendant violated his due process rights.[11]

Contrary to Abdulkadir's argument, the Court did not rule that states are required to use the language "heat of passion on sudden provocation" when distinguishing between second degree murder and manslaughter. Rather, the Court applied traditional notions of due process to the specific language adopted by the Maine Legislature.

The Nebraska Legislature, like the Maine Legislature, has also prescribed by statute a manslaughter offense. Neb. Rev. Stat. § 28-305 (Reissue 2008) states that "[a] person commits manslaughter if he kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act."

[7-9] In *State v. Smith* (*Smith I*),[12] we defined a sudden quarrel as a legally recognized and sufficient provocation

---

[7] *Mullaney v. Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

[8] Brief for appellant at 12.

[9] *Id*. at 14.

[10] *Mullaney v. Wilbur, supra* note 7.

[11] *Id*.

[12] *State v. Smith*, 282 Neb 720, 806 N.W.2d 383 (2011).

that causes a reasonable person to lose normal self-control. We explained that it does not necessarily mean an exchange of angry words or an altercation contemporaneous with an unlawful killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim.[13] The question, we said, is whether there existed reasonable and adequate provocation to excite one's passion and obscure and disturb one's power of reasoning to the extent that one acted rashly and from passion, without due deliberation and reflection, rather than from judgment.[14] We note that the district court included the following proposition of law in the jury instructions: "It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason *so that the elements necessary to constitute murder are absent*." (Emphasis supplied.) In our recent decision in *State v. Trice*,[15] we held that such an instruction was in error, because malice is not a statutory element of second degree murder in Nebraska. However, as we held in *Trice*, the inclusion of that instruction does not constitute a prejudicial error, but nonetheless it should be avoided.

We find that the district court gave the correct instruction on "sudden quarrel," which is the terminology adopted by the Nebraska Legislature. The U.S. Supreme Court's decision in *Mullaney* does not require the use of "heat of passion on sudden provocation." Furthermore, we find that "sudden quarrel," as defined by our case law, is for all intents and purposes equivalent. Therefore, we do not find that the district court's instruction on "sudden quarrel" resulted in a miscarriage of justice.

### (b) Step Instruction

Abdulkadir next argues that the step instruction given to the jury did not allow the jury to consider the crime

---

[13] *Id*.

[14] See *id*.

[15] *State v. Trice, ante* p. 183, ___ N.W.2d ___ (2013).

of manslaughter while deliberating the elements of second degree murder. Because the second degree murder instruction required the State to disprove beyond a reasonable doubt that Abdulkadir killed Grandon during a sudden quarrel, we disagree.

Our decision is guided by *State v. Smith* (*Smith II*),[16] a case we received on petition for further review from the Nebraska Court of Appeals. In *Smith II*, the district court instructed the jury to convict the defendant of second degree murder if the State proved beyond a reasonable doubt that the defendant had killed intentionally, but without premeditation. The court further instructed the jury that only if the State failed to prove one of those elements could the jury go on to consider whether the defendant had committed manslaughter.[17]

[10,11] We held that although voluntary manslaughter is a lesser degree of homicide, it is not a lesser-included offense of second degree murder under the elements test, because it is possible to commit second degree murder without committing voluntary manslaughter; one who intentionally kills another without premeditation and without the provocation of a sudden quarrel commits second degree murder, but does not simultaneously commit manslaughter.[18] Therefore, we held where there is evidence that (1) a killing occurred intentionally without premeditation and (2) the defendant was acting under the provocation of a sudden quarrel, a jury must be given the option of convicting of either second degree murder or voluntary manslaughter depending upon its resolution of the fact issue regarding provocation.[19] We found evidence of both elements and affirmed the Court of Appeals' decision to remand the cause for a new trial.[20]

Here, the jury instructions allowed the jury to resolve the fact issue regarding "upon a sudden quarrel" within the

---

[16] *State v. Smith, supra* note 2.

[17] *Id*.

[18] *Id*.

[19] *Id*.

[20] *Id*.

second degree murder instruction. By forcing the jury to decide whether a sudden quarrel existed in the second degree murder instruction, the instruction satisfied the requirements set out in *Smith II*. By convicting Abdulkadir of second degree murder, the jury necessarily found that Abdulkadir did not kill Grandon upon a sudden quarrel. Therefore, the district court did not err with its step instruction.

## 2. Autopsy Photographs

Abdulkadir argues that the admission and publication to the jury of the 15 autopsy photographs were cumulative and were outweighed by their prejudice to Abdulkadir. We disagree and find that each photograph was probative for the jury's determination of whether Abdulkadir was acting in self-defense and whether he killed as a result of a sudden quarrel.

[12-14] We review the district court's decision to admit the autopsy photographs for abuse of discretion. Although the probative value of gruesome photographs should be weighed against the possible prejudicial effect before they are admitted, if the photographs illustrate or make clear some controverted issue in a homicide case, proper foundation having been laid, they may be received, even if gruesome.[21] A defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.[22] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[23]

Here, the autopsy photographs of Grandon were admitted to show the extent of the wounds and the manner in which they resulted in his death. According to Thomsen, the wounds were consistent with defensive wounds, indicating that Grandon was trying to defend himself from Abdulkadir. Furthermore, many of the wounds indicated that Abdulkadir was striking downward on Grandon, indicating a superior position in the fight. The photographs were not inordinately gruesome, nor did

---

[21] See *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds*, *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2006).

[22] *State v. Freemont*, *supra* note 3.

[23] *Id*.

their potential prejudice substantially outweigh their probative value in detailing the nature and cause of Grandon's injuries. Therefore, the district court did not abuse its discretion in allowing the autopsy photographs into evidence.

### 3. Life to Life—Determinate Sentence

Lastly, Abdulkadir argues that the district court erred in imposing a sentence of "life to life" for second degree murder. He asserts that such sentence is in all practicality a determinate sentence which invades and usurps the province of the Legislature in defining criminal liability and the classification of punishment. We disagree. We have held that life to life is not an illegal punishment, and the Legislature has acquiesced in our reading.

Under Neb. Rev. Stat. § 29-2204(1)(a)(ii)(A) (Cum. Supp. 2012), a court imposing an indeterminate sentence upon an offender shall:

> Beginning July 1, 1998:
>
> . . . Fix the minimum and maximum limits of the sentence to be served within the limits provided by law for any class of felony other than a Class IV felony, except that when a maximum limit of life is imposed by the court for a Class IB felony, the minimum limit may be any term of years not less than the statutory mandatory minimum. If the criminal offense is a Class IV felony, the court shall fix the minimum and maximum limits of the sentence, but the minimum limit fixed by the court shall not be less than the minimum provided by law nor more than one-third of the maximum term and the maximum limit shall not be greater than the maximum provided by law[.]

[15,16] In *State v. Marrs*,[24] we rejected the argument now advanced by Abdulkadir that life-to-life imprisonment was not an authorized sentence intended by the Legislature. We concluded that there was no statutory requirement that the affirmatively stated minimum term for a Class IB felony sentence be less than the maximum term, and although

---

[24] *State v. Marrs, supra* note 4.

§ 29-2204(1)(a)(ii) permits a sentencing judge imposing a maximum term of life imprisonment for a Class IB felony to impose a minimum term of years not less than the statutory mandatory minimum, it does not require the judge to do so.[25] We held that a life-to-life sentence for second degree murder was a permissible sentence under § 29-2204.[26] We reaffirmed that decision in *State v. Moore*.[27]

[17] Abdulkadir argues that our reading of § 29-2204 usurps the province of the Legislature. It is true that once the Legislature has defined the crime and the corresponding punishment for a violation of the crime, the responsibility of the judicial branch is to apply those punishments according to the nature and range established by the Legislature.[28] However, in 2006, we interpreted the Legislature's statute to allow life-to-life sentences for second degree murder, and the Legislature has not altered the sentencing structure for Class IB felonies since our decision in *Marrs*.[29] When judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation.[30]

We find that the life-to-life sentence is not illegal under the statutes as written and that the Legislature has acquiesced to our interpretation of its statute. Therefore, we find that the district court's sentence did not usurp the legislative authority to define crimes and classify punishment.

## VI. CONCLUSION

For the foregoing reasons, we affirm Abdulkadir's convictions and sentences.

AFFIRMED.

---

[25] *Id*.

[26] *Id*.

[27] *State v. Moore*, 277 Neb. 111, 759 N.W.2d 698 (2009).

[28] *State v. Divis*, 256 Neb. 328, 589 N.W.2d 537 (1999).

[29] *State v. Marrs, supra* note 4.

[30] *State v. Policky*, 285 Neb. 612, 828 N.W.2d 163 (2013).