Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/03/2019 09:07 AM CDT

State of Nebraska, appellee, v.
Matthew J. Stubbendieck,
appellant.

___ N.W.2d ___

Filed March 29, 2019.    No. S-18-600.

1. **Convictions: Evidence: Appeal and Error.** Regardless of whether
the evidence is direct, circumstantial, or a combination thereof, and
regardless of whether the issue is labeled as a failure to direct a verdict,
insufficiency of the evidence, or failure to prove a prima facie case, the
standard is the same: In reviewing a criminal conviction, an appellate
court does not resolve conflicts in the evidence, pass on the credibility
of witnesses, or reweigh the evidence; such matters are for the finder
of fact, and a conviction will be affirmed, in the absence of prejudicial
error, if the evidence admitted at trial, viewed and construed most favor-
ably to the State, is sufficient to support the conviction.
2. **Criminal Law: Convictions: Evidence: Appeal and Error.** When
reviewing a criminal conviction for sufficiency of the evidence to
sustain the conviction, the relevant question for an appellate court is
whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential ele-
ments of the crime beyond a reasonable doubt.
3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence
Rules commit the evidentiary question at issue to the discretion of the
trial court, an appellate court reviews the admissibility of evidence for
an abuse of discretion.
4. **Trial: Rules of Evidence.** A trial court exercises its discretion in deter-
mining whether evidence is relevant and whether its prejudicial effect
substantially outweighs its probative value.
5. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
trial court's decision is based upon reasons that are untenable or unrea-
sonable or if its action is clearly against justice or conscience, reason,
and evidence.

6. **Rules of Evidence.** An analysis under Neb. Rev. Stat. § 27-403 (Reissue 2016) consists of a balancing test, which is in large part left to the sound discretion of the trial court, absent an abuse of discretion.

7. \_\_\_\_. The "relevancy-versus-unfairly-prejudicial-effect-balancing" test seeks to weigh the probative value of the proffered evidence against the nonprobative factors listed in Neb. Rev. Stat. § 27-403 (Reissue 2016).

8. **Evidence: Words and Phrases.** Probative value is a relative concept involving a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the ultimate issue of the case.

9. **Rules of Evidence: Appeal and Error.** Most, if not all, items which one party to an action offers in evidence are calculated to be prejudicial to the opposing party; therefore, it is only unfair prejudice with which an appellate court is concerned.

10. **Rules of Evidence: Words and Phrases.** "Unfair prejudice," in the context of Neb. Rev. Stat. § 27-403 (Reissue 2016), means a tendency to suggest a decision on an improper basis.

11. **Criminal Law: Evidence.** A defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.

12. **Aiding and Abetting: Proof.** Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor. No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime.

13. \_\_\_\_: \_\_\_\_. Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.

14. **Criminal Law.** The corpus delicti may be proved by circumstantial evidence.

15. **Circumstantial Evidence: Words and Phrases.** Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists.

16. **Criminal Law: Evidence: Confessions: Proof.** An extrajudicial admission or a voluntary confession is, standing alone, insufficient to prove that a crime has been committed, but either or both are competent evidence of the fact and may, with corroborative evidence of facts and circumstances, establish the corpus delicti and guilty participation of the defendant.

Appeal from the District Court for Cass County: Michael A. Smith, Judge. Affirmed.

Julie E. Bear, Deputy Cass County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## I. INTRODUCTION

Matthew J. Stubbendieck was convicted of the crime of assisting suicide,[1] a Class IV felony, in regard to the death of Alicia Wilemon-Sullivan (Sullivan). Stubbendieck was sentenced to a term of probation. He appeals his conviction on various evidentiary grounds. We affirm.

## II. BACKGROUND

On August 5, 2017, deputies from the Cass County Sheriff's Department were dispatched to an address in Weeping Water, Cass County, Nebraska, in response to a report of a suicide.

Upon arrival, deputies spoke to Stubbendieck, who reported that his girlfriend, Sullivan, had killed herself days prior. After being interviewed for more than an hour, Stubbendieck led deputies to Sullivan's body. The body was located in a densely wooded area of private land that once operated as a rock quarry.

Upon examination, it was determined that Sullivan's body was in the early stages of decomposition. Despite the stage of decomposition to the body, deputies noted injuries to both of Sullivan's wrists and further observed a knife located under Sullivan's left hand. In the immediate area surrounding Sullivan's body, deputies located two water bottles (one containing an unknown dark liquid), a potato chip can, a purse, a

---

[1] Neb. Rev. Stat. § 28-307 (Reissue 2016).

pair of sandals, and boxer briefs. The boxer briefs were later identified as belonging to Stubbendieck.

During the course of the investigation, Stubbendieck told investigators that he believed Sullivan was suffering from "Stage IV cancer." Stubbendieck indicated that Sullivan "hated" hospitals, but had been convinced by friends to undergo radiation treatments in Jacksonville, Florida. According to Stubbendieck, Sullivan terminated radiation therapy after only 5 weeks because her condition had not improved.

Investigators employed "Cellebrite," a technology used to conduct cell phone information extraction, and recovered from Stubbendieck's cell phone numerous text messages between Sullivan and Stubbendieck in the weeks leading up to Sullivan's death. In those text messages, Sullivan represents herself as being hospitalized, in pain, dying, and not able to live any longer.

Text messages from Sullivan's cell phone show a persistent state of suicidal ideation, evidenced by Sullivan's repeated threats of self-harm. Throughout the course of the lengthy text message transcript, it is clear that Stubbendieck and Sullivan developed a plan in which Sullivan would travel by plane from Florida to Nebraska in order to marry Stubbendieck, and then "go out in [Stubbendieck's] arms as [his] wife," a reference to a prearranged plan in which Sullivan would end her life.

Stubbendieck subsequently enlisted the assistance of his mother to purchase a one-way airline ticket to bring Sullivan to Nebraska. Prior to Sullivan's arrival, Stubbendieck set out in search of narcotics in order to assist Sullivan in committing suicide. According to Christine Timbs, a romantic acquaintance of Stubbendieck's, Stubbendieck asked Timbs if she could acquire heroin or morphine in order to make Sullivan more comfortable. A coworker of Stubbendieck testified that Stubbendieck had indicated that he had four doses of liquid morphine for Sullivan to take. Yet another coworker testified that Stubbendieck had told him that he planned to

"[s]hoot her [Sullivan] up with morphine" in order to "put her to sleep."

Sullivan arrived in Nebraska on July 31, 2017. The day following Sullivan's arrival, Sullivan was reportedly observed taking an unknown quantity and type of pill two to three times throughout the morning. Stubbendieck indicated that he took Sullivan to a remote area of Weeping Water, locally referred to as "Acapulco Lake." According to Stubbendieck, once at the lake, the two went swimming and had intercourse before Sullivan retrieved a knife and began cutting her wrists.

Stubbendieck indicated that the two remained in the remote area for approximately 8 hours. Stubbendieck admitted that during that time, on two occasions, he attempted to assist Sullivan by covering her nose and mouth in order to suffocate her. Stubbendieck told investigators that Sullivan was alive and conversing with him when he left her 7½ hours after arriving at the location.

After Stubbendieck led deputies to Sullivan's body, an investigation ensued that included the recovery of text messages, interviews with witnesses to whom Stubbendieck had confided, and an autopsy of Sullivan. Stubbendieck was arrested by Cass County Sheriff's Department investigators and subsequently charged with assisting suicide.

At trial, the State presented evidence in the form of text messages between Sullivan and Stubbendieck, which indicated Sullivan's desire to end her life and the ensuing plan to arrange for Sullivan's travel to Nebraska. In addition to text message conversations between Sullivan and Stubbendieck, the State offered, over a motion in limine and a continuing objection of defense counsel at trial, text conversations between Stubbendieck and Timbs. These text messages were offered in order to show both Stubbendieck's motive and plan. The State further provided testimony from Dr. Michelle Elieff, a forensic pathologist who performed Sullivan's autopsy. That testimony was also contested by way of a motion in limine and a continuing objection of defense counsel at trial.

Elieff testified that Sullivan's body was in a state of moderate decomposition, but that other than the cuts to Sullivan's wrists, the examination did not reveal any signs of traumatic injury, natural disease, or illness. Elieff, however, testified that the toxicology report indicated Sullivan had morphine in her liver measuring 876 nanograms per gram of tissue, an amount that Elieff testified was within the range of some fatal cases. Elieff indicated further testing revealed that Sullivan also had Tylenol, Benadryl, and alcohol in her system. Elieff testified that the cause of death was "undetermined." She stated that based on the circumstances surrounding Sullivan's death, the investigative information, and the condition of the body, "there were certain things that could not be excluded as causing or contributing factors."

Specifically, Elieff's official report, accepted in evidence, indicated that "[b]ased on the autopsy findings and ancillary tests, contributing factors such as asphyxia (smothering), drugs, and the environment (hypothermia) cannot be entirely excluded."

Following a jury trial, Stubbendieck was found guilty of assisting suicide and subsequently sentenced to a term of probation. Stubbendieck appeals.

## III. ASSIGNMENTS OF ERROR

Stubbendieck assigns, consolidated and restated, that (1) the district court erred in admitting certain testimonial evidence and text messages that were irrelevant and unfairly prejudicial and (2) there was insufficient evidence to support the conviction.

## IV. STANDARD OF REVIEW

[1] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on

the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.[2]

[2] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

[3-5] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, we review the admissibility of evidence for an abuse of discretion.[4] A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value.[5] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[6]

## V. ANALYSIS

### 1. Admissibility and Unfair Prejudice

#### (a) Testimony of Elieff

Stubbendieck assigns that the district court erred in allowing the testimony of Elieff, the forensic pathologist who performed Sullivan's autopsy. Stubbendieck's argument is grounded in his contention that Elieff was not able to opine as to the cause of Sullivan's death, thus rendering Elieff's testimony irrelevant

---

[2] *State v. White*, 272 Neb. 421, 722 N.W.2d 343 (2006).

[3] *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

[4] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[5] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[6] See *State v. Henderson, supra* note 4.

and prejudicial. As such, Stubbendieck contends that under Neb. Rev. Stat. § 27-402 (Reissue 2016), Elieff's testimony is inadmissible. While Stubbendieck does not explicitly point to Neb. Rev. Stat. § 27-403 (Reissue 2016), he does claim that Elieff's testimony was "highly prejudicial,"[7] and further indicates that he fears the testimony resulted in a "danger of unfair prejudice,"[8] which leads us to review Stubbendieck's claim of prejudice under a § 27-403 analysis in addition to our § 27-402 analysis.

First, we turn to Stubbendieck's claim that Elieff's testimony was irrelevant. Under § 27-402:

> All relevant evidence is admissible except as otherwise provided by the Constitution of the United States or the State of Nebraska, by Act of Congress or of the Legislature of the State of Nebraska, by these rules, or by other rules adopted by the Supreme Court of Nebraska which are not in conflict with laws governing such matters. Evidence which is not relevant is not admissible.

Here, the district court noted that the testimony regarding Sullivan's autopsy was relevant. Specifically, the court stated that "the charge as described in statute includes aiding and abetting a suicide- a definition which includes affirmative acts allegedly done by a defendant that result in the death of another." Having made the determination that Elieff's testimony would likely provide information as to affirmative acts that brought about Sullivan's death, the court overruled Stubbendieck's objections.

In light of evidence presented at trial with regard to Stubbendieck's attempts to procure morphine in order to aid Sullivan in committing suicide, the factual testimony of Elieff regarding the presence of morphine or other substances in Sullivan's system cannot be said to be irrelevant. Nor can

---

[7] Brief for appellant at 17.

[8] *Id.*

the testimony regarding the overall findings of the autopsy be seen as irrelevant, as the findings provide factual information regarding the state of the body and any evidence or lack of evidence. This information can be useful to the trier of fact in determining whether a suicide did in fact occur and to what extent the defendant aided the deceased party under the circumstances.

We next turn to Stubbendieck's argument under § 27-403 concerning the prejudicial effect of the court's decision to admit Elieff's testimony and autopsy findings. Under § 27-403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

With regard to § 27-403, Stubbendieck contends that the relevancy of Elieff's testimony and results of the autopsy are outweighed by the danger of unfair prejudice and the risk that the testimony misled the jury. Specifically, Stubbendieck argues that Elieff's testimony left the jury to speculate as to the cause of Sullivan's death: whether it was due to asphyxiation, the cuts to Sullivan's wrists, the ingestion of a lethal dose of morphine, or hypothermia. Therefore, Stubbendieck appears to suggest that the jury was left with only the option to convict Stubbendieck of assisting suicide, supported by evidence suggesting a more nefarious act with which he had not been charged.

[6,7] An analysis under § 27-403 consists of a balancing test, which is in large part left to the sound discretion of the trial court, absent an abuse of discretion.[9] The "relevancy-versus-unfairly-prejudicial-effect-balancing" test seeks to weigh the probative value of the proffered evidence against the nonprobative factors listed in § 27-403.[10]

---

[9] See R. Collin Mangrum, Mangrum on Nebraska Evidence 209 (2018).

[10] See *id.* at 212.

[8] First, the court weighs the probative value of the proffered testimony, a relative concept involving a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the ultimate issue of the case.[11] The next step requires that the court weigh the probative value against the unfairly prejudicial effects listed in § 27-403. Only if the probative value is substantially outweighed by the prejudicial effect may the court exclude the evidence.

In light of the balancing test described above, Stubbendieck's argument discounts the fact that while the cause and manner of death were found to be undetermined by Elieff, the autopsy presented relevant probative evidence that was germane to the crime of assisting suicide with which Stubbendieck was charged. In his motion in limine, Stubbendieck sought to stipulate to the cause of Sullivan's death by stating that he "is willing to stipulate that the cause of death for . . . Sullivan is suicide."

Despite Stubbendieck's tactical trial strategy to prevent the introduction of evidence, the factual evidence contained in the autopsy and testified to at trial was directly connected to the elements charged. As noted by Justice Souter in *Old Chief v. United States*[12]:

> Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. This persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them.

---

[11] *State v. Bostwick*, 222 Neb. 631, 385 N.W.2d 906 (1986).

[12] *Old Chief v. United States*, 519 U.S. 172, 187, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

The facts contained in the autopsy and Elieff's testimony undoubtedly relate to the charge of assisting suicide, with which Stubbendieck was tried. Elieff's testimony was relevant to the extent that it provided the trier of fact with evidence that the injuries sustained and drugs ingested were in furtherance of a successful attempt at suicide and not the result of natural causes. The fact that Sullivan's body was found to have a lethal amount of morphine cannot be discounted, especially as it relates to the testimonial evidence regarding Stubbendieck's attempts to acquire morphine in furtherance of Sullivan's plan, an affirmative act which constitutes aiding or abetting under § 28-307.

[9,10] Most, if not all, items which one party to an action offers in evidence are calculated to be prejudicial to the opposing party; therefore, it is only "unfair prejudice" with which we are concerned.[13] In the context of § 27-403, such prejudice means a tendency to suggest a decision on an improper basis.[14]

[11] Additionally, we have previously articulated that if an exhibit is relevant and illustrates or makes clear some controverted issue in a case, a defendant cannot negate an exhibit's probative value through a tactical decision to stipulate.[15] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[16]

On balance, we cannot say that the trial court abused its discretion in permitting Elieff's testimony regarding the findings of the post mortem examination of Sullivan.

### (b) Admission of Text Messages

Stubbendieck makes a similar argument with regard to the court's admission of text messages shared between

---

[13] See *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990).

[14] See *Benzel v. Keller Indus.*, 253 Neb. 20, 567 N.W.2d 552 (1997).

[15] *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013).

[16] *Id.*

Stubbendieck and Timbs. Stubbendieck objected to the admission of text messages in a motion in limine and through his continuing objection at trial.

Stubbendieck argues that the text messages of a romantic nature between Timbs and him were used by the state to "impugn his love for . . . Sullivan, and place him in an unfavorable light to the jury."[17] While Stubbendieck admits that some text messages directly relate and "could be perceived to have importance," he argues that text messages of a romantic nature "bear no relevance to the proof of any fact that is of consequence to the determination of whether . . . Stubbendieck assisted in the suicide of . . . Sullivan."[18]

While Stubbendieck again fails to argue with specificity the basis on which he challenges the court's determination regarding the admission of text messages and testimony involving Timbs, he does make reference to issues of relevance and unfair prejudice, rules which are discussed above.

Stubbendieck fails to point to any specific text message that demonstrates undue prejudice or is irrelevant standing alone. The trial court exercised its discretion in determining that the evidence was relevant and that its prejudicial effect did not substantially outweigh its probative value.[19] We review the admissibility of evidence for an abuse of discretion.[20]

In reviewing the district court's decision, we conduct a § 27-403 analysis against the backdrop of our standard of review for abuse of discretion. In conducting our review for abuse of discretion, we first consider the court's weighing of the probative value of the proffered evidence, then in the second step of the analysis, how the court weighed the probative value against the unfairly prejudicial effects listed in § 27-403.

---

[17] Brief for appellant at 19.

[18] *Id.*

[19] *State v. Bauldwin, supra* note 5.

[20] *State v. Henderson, supra* note 4.

With regard to the court's admission of text messages between Stubbendieck and Timbs, the court found that the testimony and exhibits of "those communications are relevant as to a possible motive and to [Stubbendieck's] planning to commit the crime, and may go to the weight and credibility of other testimony by . . . Timbs." The text message conversations between Stubbendieck and Timbs give context to the relationship that Stubbendieck and Timbs shared in which he confided to Timbs details of Sullivan's plan to die. Further, the text messages corroborate Timbs' testimony at trial.

Of the several text message conversations that exist between Stubbendieck and Timbs, one particularly illuminating message reveals the level of trust Stubbendieck shared with Timbs, as demonstrated by Stubbendieck's revealing certain aspects of the plan to end Sullivan's life. This particular series of text messages sent from Stubbendieck to Timbs on July 31, 2017, stated: "I will be honest and she flew in early. She will be passed by sunrise [W]ednesday morning. Please bare [sic] with me. I[']m getting home from work and dinner with family and jumping in shower. She is with my parents. I miss you." Approximately 7 minutes later, Stubbendieck sent a text message to Timbs, which stated: "Please answer me. I can't have you mad. I enjoy our time so much and can't wait to get back to it."

At trial, Timbs testified to an oral conversation she shared with Stubbendieck in which he asked her if she could obtain heroin or morphine. Timbs further testified that following Sullivan's death, Stubbendieck and Timbs exchanged text messages in which he sought to speak to her on the telephone. In her testimony regarding their oral conversation that followed, Timbs stated:

> He was crying hysterically, telling me that they went out for a drive that day. She had gotten rid of all of her personal belongings and cell phone, then they were walking in the woods. . . . He walked off . . . . When he came back he didn't find her anywhere. When he found her he

said there was blood everywhere. . . . Then he said he laid
there and held her for a while.

In this conversation, largely corroborated by text messages
sent on August 1, 2017, between approximately 10:11 and
10:50 p.m., Stubbendieck confided in Timbs the execution of
Sullivan's plan and his role in her death.

In addition to the corroborative effect of the text messages
between Stubbendieck and Timbs, the messages signal a con-
nection between Stubbendieck and "Lake Acapulco," the loca-
tion where Sullivan's body was found. In those messages, this
lake is referenced on three separate occasions as a place known
to both individuals. Therefore, we cannot say that the court
abused its discretion in finding that the text conversations had
strong probative value.

The next step in the analysis required that the district
court weigh the probative value against the unfairly prejudicial
effects listed in § 27-403. Unfair prejudice means an undue
tendency to suggest a decision based on an improper basis.[21]
It speaks to the capacity of some concededly relevant evidence
to lure the fact finder into declaring guilt on a ground different
from proof specific to the offense charged, commonly on an
emotional basis.[22]

It cannot be said that the romantic undertones of
Stubbendieck's text messages rise to the level of unfair prej-
udice in light of the discussion above. This conclusion is
grounded in the fact that the substantive information contained
within the text messages provides the finder of fact with
information that goes directly to Stubbendieck's motive and
plan. For that same reason, it cannot be said that the text mes-
sages lack relevance. The entire text message history between
Stubbendieck and Timbs provides context to their relationship
as it related to Sullivan and to Stubbendieck's actions sur-
rounding Sullivan's death.

---

[21] *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018).

[22] *Id.*

We cannot say that the district court abused its discretion in admitting the text messages between Stubbendieck and Timbs.

## 2. Sufficiency of Evidence

Stubbendieck argues that the evidence adduced at trial was insufficient to sustain a conviction for assisting suicide. It is Stubbendieck's contention that the evidence failed to demonstrate active participation in the planning or execution of Sullivan's suicide.

### (a) Aiding and Abetting

In Nebraska, aiding and abetting under Neb. Rev. Stat. § 28-206 (Reissue 2016) is not a separate crime. Rather, it is another theory for holding one liable for the underlying crime.[23] Suicide or attempted suicide has not been criminalized in Nebraska, thus one cannot be held criminally liable for aiding and abetting suicide, pursuant to § 28-206. However, the Nebraska Legislature established the separate crime of assisting suicide under § 28-307. The statute relies largely on the term "aids and abets," which the Legislature left undefined in §§ 28-206 and 28-307.

[12,13] Specifically, the language of § 28-307 states: "A person commits assisting suicide when, with intent to assist another person in committing suicide, he aids and abets him in committing or attempting to commit suicide." While §§ 28-206 and 28-307 fail to define the term "aiding and abetting," our longstanding jurisprudence indicates that aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor.[24] No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime

---

[23] *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[24] *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002).

or that there was an express agreement to commit the crime.[25] Yet, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.[26]

Here, Stubbendieck argues that he merely acquiesced to Sullivan's planned suicide. Stubbendieck contends that his purchase of an airline ticket for Sullivan to travel to Nebraska as contemplated in her plan, his attempts to procure morphine on her behalf, and his mere presence as she engaged in the life-taking act were insufficient to sustain his conviction.

However, viewed in the light most favorable to the State, Stubbendieck did more than simply acquiesce to Sullivan's acts. As demonstrated by the evidence contained in text messages between Stubbendieck and Sullivan, Stubbendieck encouraged Sullivan to come to Nebraska in order to end her life. In one of Sullivan's many text message conversations to Stubbendieck regarding Sullivan's taking her life, she wrote that "[t]his[]is the final end baby." Stubbendieck replied, "When you get here. We both need this. I promise it will be what you want and what I need. Please."

Further evidence in the form of witness testimony demonstrated that Stubbendieck actively sought out and ostensibly obtained liquid morphine in order to "put [Sullivan] to sleep." Even if these acts alone were not enough, Stubbendieck, by his own admission, intentionally and voluntarily engaged in the act of attempting to asphyxiate Sullivan, first by covering her nose and mouth with his hand to prevent her from breathing, and later using a pair of boxer shorts to aid him in covering her nose and mouth in order to bring her life to an end.

As stated above, aiding and abetting requires some participation in a criminal act, which must be evidenced by word, act, or deed. Further, mere encouragement or assistance is sufficient. While we have said that no particular acts are necessary, nor is

[25] Id.

[26] Id.

it necessary that the defendant take physical part in the act, the record, including Stubbendieck's own admissions, demonstrate that viewed in a light most favorable to the State, Stubbendieck took more than a passive role in bringing about Sullivan's ultimate demise, as evidenced by his above-referenced acts.

### (b) Elieff's Testimony

Next, Stubbendieck argues that the inability of Elieff, the pathologist, to render an opinion as to the cause or manner of Sullivan's death required the court to make a "quantum leap" in the evidence to reach the conclusion that Stubbendieck assisted in a suicide.[27]

While the condition of Sullivan's body did not enable Elieff to determine the probable cause or manner of death, Elieff concluded that Sullivan, with the exception of the cuts to both of her wrists, had not sustained a traumatic injury such as a gunshot wound or penetrating injury. However, the decomposition of the body prevented Elieff from determining whether Sullivan had died from contributing factors such as asphyxiation, hypothermia, or drug overdose.

[14,15] To sustain a conviction for a crime, the corpus delicti must be proved beyond a reasonable doubt.[28] The corpus delicti is the body or substance of a crime, the fact that a crime has been committed without regard to the identity of the person committing it.[29] The corpus delicti may be proved by circumstantial evidence.[30] Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists.[31]

[16] An extrajudicial admission or a voluntary confession is, standing alone, insufficient to prove that a crime has been

---

[27] Brief for appellant at 16.

[28] *Reyes v. State*, 151 Neb. 636, 38 N.W.2d 539 (1949).

[29] *Id.*

[30] *State v. Payne*, 205 Neb. 522, 289 N.W.2d 173 (1980).

[31] *State v. Blackman*, 254 Neb. 941, 580 N.W.2d 546 (1998).

committed, but either or both are competent evidence of the fact and may, with corroborative evidence of facts and circumstances, establish the corpus delicti and guilty participation of the defendant.[32]

In this case, Stubbendieck had numerous conversations with Sullivan about her plan to end her life. In those conversations, the two discussed Sullivan's taking her life and dying along the water's edge and in Stubbendieck's arms. The two forged and carried out a plan to transport Sullivan to Nebraska in order to conclude the contemplated act. In addition to his conversations with Sullivan, Stubbendieck sought to procure morphine from Timbs, and later told his coworkers that he had obtained morphine. Although Stubbendieck contends that the plan had changed and that morphine was no longer a part of the scheme, Sullivan's autopsy revealed she had morphine in her liver measuring 876 nanograms per gram of tissue, an amount that Elieff testified was known to be within the lethal spectrum. Further, as demonstrated in the record, Stubbendieck's insistence that Sullivan come to Nebraska to carry out her suicidal intentions because "[w]e both need this" cannot be characterized as anything but encouragement.

Having viewed the evidence in the light most favorable to the prosecution, we hold that any rational trier of fact could have found, beyond a reasonable doubt, that Stubbendieck did aid and abet Sullivan in committing suicide.

Stubbendieck's assignment of error is without merit.

## VI. CONCLUSION

We conclude that there was sufficient evidence to support Stubbendieck's conviction. The district court did not err in admitting the testimonial evidence and text messages.

AFFIRMED.

---

[32] *Olney v. State*, 169 Neb. 717, 100 N.W.2d 838 (1960).